1  RICHARD J. NELSON (State Bar No. 141658)
   E-Mail:      rnelson@sideman.com
2  ZACHARY J. ALINDER (State Bar No. 209009)
   E-Mail:      zalinder@sideman.com
3  ELLEN P. LIU(State Bar No. 280459)
   E-Mail:      eliu@sideman.com
4  SIDEMAN & BANCROFT LLP
   One Embarcadero Center, Twenty-Second Floor
5  San Francisco, California 94111-3711
   Telephone:   (415) 392-1960
6  Facsimile:   (415) 392-0827
7

8  Attorneys for Plaintiffs
   Cisco Systems, Inc. and Cisco Technology, Inc.
9

10                  **UNITED STATES DISTRICT COURT**

11               **NORTHERN DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| CISCO SYSTEMS, INC., a California corporation, and CISCO TECHNOLOGY, INC., a California corporation, | Case No. |
| | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** |
| Plaintiffs, | **1. TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114(1)(a);** |
| v. | **2. TRADEMARK COUNTERFEITING, 15 U.S.C. § 1114(1)(b);** |
| BECCELA'S ETC., LLC, a California limited liability company, and DOES 1-50, | **3. FALSE ADVERTISING, 15 U.S.C. § 1125(a);** |
| | **4. CALIFORNIA COMMON LAW TRADEMARK INFRINGEMENT;** |
| Defendants. | **5. CALIFORNIA STATUTORY MISLEADING AND DECEPTIVE ADVERTISING, CAL. BUS. & PROF. CODE § 17500 et seq.)** |
| | **6. INDUCING BREACH OF CONTRACT;** |
| | **7. CONVERSION;** |
| | **8. CALIFORNIA FALSE ADVERTISING, CAL. BUS. & PROF. CODE § 17200 et seq.** |
| | **DEMAND FOR JURY TRIAL** |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Plaintiffs Cisco Systems, Inc. ("CSI") and Cisco Technology, Inc. ("CTI" and together with CSI, "Cisco" or "Plaintiffs"), hereby complain and allege against Defendants Beccela Etc., LLC, doing business as BecTech Global and Tuksy ("BecTech" or "Defendant"), and Does 1-50, inclusive (collectively "Defendants") as follows:

## I.    INTRODUCTION

1.      This case seeks to stop the willful corporate theft, mass infringement and counterfeiting, related unfair competition, and corruption of channel partners arising from Defendants' resale of Cisco products and services.  The deliberate and unlawful scheme uncovered by Cisco demonstrates that Defendant is involved in discount fraud schemes, and also knowingly, intentionally, and routinely induced Cisco's authorized resellers to breach their contracts with Cisco.  Cisco brings this lawsuit to stop Defendant's illegal and infringing conduct and to recover for the significant damage it has caused.

## II.    THE PARTIES

2.      Plaintiff Cisco Systems, Inc., is, and at all times mentioned herein was, a California corporation, with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.  Plaintiff Cisco Technology, Inc., is, and at all times mentioned herein was, a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.  CTI owns the trademarks used by CSI in marketing Cisco-branded products.

3.      Defendant Beccela Etc., LLC, is, and at all relevant times was, a California limited liability company, operating in the County of Orange, in the State of California.  During the time period relevant to this matter, Beccela Etc., LLC, did business as BecTech Global and as Tuksy.

4.      Cisco is currently unaware of the true names and capacities of Does 1 through 50, inclusive, whether individual, corporate, associate, or otherwise. Due to the surreptitious nature of Defendants' actions, the identities of Does 1 through 50 have been concealed from Cisco, preventing Cisco from identifying them by name.  After discovery, which is necessary to ascertain the true names and capacities of Does 1 through 50, Cisco will amend this Complaint to show the true names and capacities of these Doe defendants and allege the necessary identifying details.

5.      Cisco is informed and believes, and thereon alleges, that each of the Defendants

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  designated herein as a Doe is legally responsible, in some manner, for the events and happenings

2  herein referred to, and legally caused damages to Cisco as herein alleged.

3        6.    Cisco is informed and believes, and thereon alleges, that Defendant is a citizen and

4  resident of the State of California, and/or is doing business in the State of California, and/or

5  participated in or undertook obligations or rights arising out of the subject events and happenings

6  herein referred to, engaged in actions or omissions, either intentional or negligent, regarding the

7  subject events and happenings herein referred to, and/or benefited unjustly from the efforts, work

8  and goods of Cisco.

9        7.    At all times relevant to this action, each defendant, including those fictitiously

10  named defendants, was the agent, servant, employee, partner, joint venturer, representative,

11  subsidiary, parent, affiliate, alter ego, or co-conspirator of the other defendants and was acting

12  within the scope of that agency, service, employment, partnership, joint venture, representation,

13  affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

14               **III.    JURISDICTION**

15        8.    This is an Action for violations of the Trademark Act of 1946, 15 U.S.C. §§ 1051

16  *et seq.* (the "Lanham Act").  This Court has original subject matter jurisdiction over this Action

17  pursuant to the provision of the Lanham Act, 15 U.S.C. § 1121, as well as under 28 U.S.C. §§

18  1331 and 1338(a) and (b).

19        9.    This Court has supplemental subject matter jurisdiction over the pendent state law

20  claims under 28 U.S.C. § 1367, because these claims are so related to Cisco's claims under federal

21  law that they form part of the same case or controversy and derive from a common nucleus of

22  operative facts.

23        10.    This Court has personal jurisdiction over Defendants, who have engaged in

24  business activities in this district, misled consumers in this district, directed business activities at

25  this district, and have committed tortious acts with knowledge that the effects of their acts would

26  be felt by Cisco in this district.

27           **IV.    VENUE AND INTRA-DISTRICT ASSIGNMENT**

28        11.    Venue is proper in this district, pursuant to 28 U.S.C. § 1391, because a substantial

1    part of the events or omissions giving rise to Cisco's claims occurred in this judicial district, and a

2    substantial part of the property that is the subject of the action is situated in this district.

3        12.    In accordance with Civ. L.R. 3-2(c), this action is properly assigned on a District-

4    wide basis because it relates to Intellectual Property Rights.

5    **V. FACTUAL ALLEGATIONS RELEVANT TO CISCO, ITS INTELLECTUAL**

6    **PROPERTY, AND DEFENDANT'S UNLAWFUL SCHEME**

7        **A.    Cisco's Business And History**

8        13.    Founded in 1984, Cisco is the worldwide leader in developing, implementing, and

9    providing the technologies behind networking communications, and information technology

10   products and services.  Cisco develops and provides a broad range of networking products and

11   services that enable seamless communication among individuals, businesses, public institutions,

12   government agencies, and service providers.  Specifically, the thousands of engineers who work at

13   Cisco develop and provide networking and communications hardware, software, and services that

14   utilize cutting-edge technologies to transport data, voice, and video within buildings, across cities

15   and campuses, and around the world.

16       14.    Since its founding, Cisco has pioneered many of the important technologies that

17   created and enabled global interconnectivity.  During the past three decades, Cisco has invested

18   billions of dollars, and the time and dedication of thousands of its engineers, in the research,

19   development, and sale of industry leading networking and communications products and services.

20       15.    Cisco has also built up tremendous goodwill and brand reputation among

21   consumers, including corporate and government consumers, through significant investment in

22   advertising, promoting, and delivering products, software, and services of the highest quality

23   under Cisco's trade name and the family of Cisco-related trademarks (the "Cisco Marks").  Cisco

24   has used the family of Cisco Marks to identify goods and services as being genuine and

25   authorized, and therefore, the Cisco Marks are well-recognized signifiers of Cisco's best-in-class

26   products, software, and services.

27       **B.    Cisco's Trademarks**

28       16.    CTI owns all rights, title, and interest in the Cisco Marks, which are included on

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

the Principal Register of the U.S. Patent and Trademark Office.  The Cisco Marks are well-known.  They are used in connection with Cisco's networking hardware and software products and services.  They include, but are not limited to, the following marks that are used in interstate commerce:

| Mark | Registration Number | Registration Date |
| --- | --- | --- |
| CISCO | 1,542,339 | June 6, 1989 |
| CISCO SYSTEMS | 1,996,957 | August 27, 1996 |
| CISCO | 2,498,746 | October 16, 2001 |
| CISCO | 3,759,451 | March 9, 2010 |
| CISCO | 3,978,294 | June 14, 2011 |
| CISCO | 4,263,591 | December 25, 2012 |

17.     The Cisco Marks are distinctive, having no meaning outside of their use by Cisco in its course of business operations and in its advertising to distinguish its products and services. Cisco uses the Cisco Marks to advertise through a wide variety of media including television, radio, newspapers, magazines, billboards, direct mail, and web sites.

18.     Cisco has attained one of the highest levels of brand recognition among consumers due to its extensive advertising and promotional efforts and its continuous use of its core Cisco Marks for the past three decades.  As a result of Cisco's longstanding and widespread use and promotion of the Cisco Marks, Cisco customers around the globe have come to rely upon the Cisco Marks to identify Cisco's high-quality hardware, software, and services.  Many of Cisco's products are purchased by the U.S. Government, the military, hospitals, and by other industries, in critical and life-essential applications.

19.     Cisco's customers associate Cisco's famous and well-known trademarks, including, among others, CISCO and the Cisco Logo exclusively with Cisco and Cisco's products and services. When consumers encounter these marks and decide to purchase goods and services identified by these marks, they expect to receive genuine Cisco products that have been produced by Cisco.  Moreover, when consumers purchase products that are advertised as "new factory

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   sealed," they believe that they are purchasing genuine products manufactured by Cisco that have

2   not been tampered with from the time the product was sealed in its shipping packaging.

3   **C.   Counterfeit And Otherwise Materially Different "Cisco" Products**

4   20.   Counterfeit products that bear markings similar to the Cisco Marks provide

5   customers with a false assurance that the products they have purchased (1) are reliable and

6   conform with Cisco's high standards, (2) come with applicable warranties, (3) can be placed under

7   a Cisco service support contract (*i.e.,* SMARTnet), and (4) come with all of the necessary

8   accessories sold with the product that have been selected and approved by Cisco for use with the

9   product.

10   21.   In addition to harm to customers, the sale of counterfeit Cisco products also harms

11   Cisco in many ways.  Among these, counterfeit Cisco products which fail or degrade create the

12   false impression that Cisco products are unreliable, thereby improperly tarnishing Cisco's

13   reputation and causing Cisco to suffer lost sales and future business opportunities.  When

14   customers purchase Cisco-branded parts that are counterfeit and unreliable, their image of Cisco is

15   diminished and Cisco's opportunity to sell genuine, high-quality products to those customers may

16   be lost forever.  As a result, Cisco suffers substantial and irreparable harm to its brand, image,

17   business, and goodwill with the public.  Cisco also suffers lost sales when customers purchase

18   counterfeit products instead of genuine Cisco products.

19   22.   Cisco and its customers are also harmed when high-quality Cisco-authorized

20   accessories and/or components are replaced with accessories/components of unknown quality by

21   counterfeiters or other unauthorized resellers.  Cisco-authorized accessories/components,

22   including power cords, are high-quality and function properly with the corresponding Cisco

23   product and operate safely for the region that the product is intended to be sold.

24   Accessories/components from various third party suppliers often work together in one functioning

25   unit.  Not only does Cisco need to assess each particular accessory/component, but Cisco also

26   conducts an end-to-end technical and safety assessment once the various components and other

27   accessories are configured and working together.

28   23.   Cisco switches and similar products that are sold outside the United States include

power cords that are specific to the region or country in which the product is sold.  Cisco carefully selects power cords that provide reliable, safe electricity to the product.  Using unapproved power cords injects a degree of uncertainty into the safe use of Cisco products.  On information and belief, Cisco customers view safety and reliability of Cisco products as important and material reasons to select those products, and therefore, the use of unauthorized, unsafe and/or unoriginal power cords would be material to their purchasing decision.

**D.      Cisco's Warranty and Support Programs**

24.      Cisco supports its products through several means, including: (1) a warranty program that varies based on the product, ranging from 90 days to a limited lifetime warranty ("Warranty"), and (2) a more comprehensive suite of service and support offered to customers for a fee, collectively called SMARTnet Service ("SMARTnet").  The Cisco Warranty is non-transferable and is provided solely to the original End User of the equipment.  A SMARTnet contract entitles the holder of the contract to receive software updates and upgrades for the hardware that is covered by the contract, access to Cisco's Technical Assistance Center ("TAC"), and oftentimes advance replacement of the product if it fails and TAC cannot assist the customer to make it operational.  Cisco SMARTnet contracts are available to the original End User of the product, unless the product is inspected and re-licensed by a subsequent End User, in which case the subsequent End User is entitled to purchase a SMARTnet contract.  Only Authorized Channel Partners are permitted to sell SMARTnet contracts, and then only to End Users for products purchased through Cisco's authorized sales channel.

**E.      Cisco's Sales and Distribution Channels**

25.      Cisco is one of the United States' largest and most innovative companies.  The volume of Cisco's yearly sales revenue of hardware, software, and related services is approximately $50 billion dollars world-wide.  In order to support this global market, for the great majority of its sales, Cisco relies upon a system of independent distributors and resellers located throughout the world.  This system is commonly used in the IT hardware and networking industry.  These independent distributors and resellers, referred to as "Authorized Channel Partners" or "Authorized Resellers," typically represent several other equipment manufacturers, in addition to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   Cisco.  Among other things, Cisco's distribution system allows it to maintain expertise and a local

2   presence in regions of the world where there would not otherwise be sufficient business to support

3   it.

4     26. Authorized Resellers are required to enter into contractual relationships with Cisco

5   that allow them to purchase Cisco products and services at a partner discount from Cisco's

6   authorized distributors.  The most common contractual relationship is called an Indirect Channel

7   Partnership Agreement ("ICPA").  This agreement requires Authorized Resellers to purchase

8   Cisco products and services only from Cisco or authorized distributors and to sell those products

9   and services only to end customers for their internal use ("End Users").  Cisco incorporates the

10  ICPA in this Complaint by this reference, as if set forth here in full.  A true and correct copy of the

11  current ICPA is attached as Exhibit A.

12    27. Cisco's Authorized Resellers are the direct interface with the customers who use

13  Cisco's products and services.  Cisco's Authorized Resellers identify sales opportunities, provide

14  technical assistance in selecting products, recommend solutions to address their customers' unique

15  needs, conduct pre-sales and sales support, supply the needed products, and providing post-sales

16  support for the products.

17    28. Cisco sells products to its authorized Distributors at set prices, which can also be

18  expressed as a "discount" from Cisco's Global List Price for the products.  Those Distributors are

19  permitted to sell those products to Authorized Resellers, which is negotiated between the Partner

20  and Distributor, but which anticipate that the distributer will sell the products to the Cisco

21  Authorized Reseller for a "standard discount" of the Global List Price.  Partners can typically

22  purchase Cisco products at about 35-38% off of the Global List Price.  In other words, a $1,000

23  list price product would cost a Partner between $620-$650.

24    29. Standard discounts may not, in some situations, be sufficient in light of the end

25  customer's volume purchases, competition from competitors, or other similar business reasons. In

26  those circumstances, Authorized Resellers submit requests for non-standard discounts, which

27  includes a complete Bill of Materials for the project, along with the reasons for the special request.

28  Cisco analyzes the business case for non-standard discount requests to determine whether the

1   requested discounts are justified, whether some lesser amount of discounts should be offered, or

2   whether the request should be rejected in its entirety.  As the level of the requested discount

3   increases, so does the required level of review and approval by sales and financial management.  If

4   approved, the special discount is passed through Cisco's distribution channel for the Authorized

5   Reseller for the products to be sold to the specified end customer.

6          30.     Despite the controls described above, individuals have defrauded Cisco by making

7   misrepresentations about a specific end customer desiring to purchase a large amount of product,

8   when in fact this is just a ruse to falsely induce Cisco to sell products at a high discount.  Cisco

9   catches many of these frauds and stops them before any product is shipped.  However, in some

10  circumstances the fraud is not detected.  Due to increasing occurrences of fraud in these non-

11  standard discount requests, Cisco trains its personnel and Authorized Resellers to avoid and deter

12  discount fraud.  This training is quite successful, as Cisco has shut down a number of suspected

13  discount fraud deals when Cisco sales personnel or Cisco partners have reported suspicious deal

14  and discount justifications.  Unfortunately, not all fraudulent deals are detected before they occur.

15         **F.      Misleading Marketing and Advertising By Defendants**

16         31.     BecTech operates a website at www.bectechglobal.com.  On July 10, 2017, the

17  "About Us" page on the BecTech website claimed that they "have developed powerful

18  partnerships with industry leading suppliers to ensure that our clients have immediate access to the

19  most current technologies at the very best prices."  Contrary to the implication of this statement,

20  BecTech is not a member of Cisco's channel sales organization, and is not a Cisco "partner."

21  Indeed, Cisco has never had any contractual relationship with BecTech.

22         32.     BecTech stated on the "Returns" page of its website that they accepted returns

23  within 30 days of receipt.  BecTech does not disclose that the Cisco products it sells do not come

24  with a manufacturer warranty.

25         33.     BecTech also operates a storefront on Amazon.com.  On July 10, 2017, BecTech

26  made the same misleading claim on the Amazon storefront that it had "powerful partnerships with

27  industry leading suppliers."

28         34.     BecTech also operates a storefront on eBay.  On July 10, 2017, BecTech advertised

Case No._____

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    37 separate Cisco products on the eBay store.  All except for four products were advertised as

2    "BRAND NEW FACTORY SEALED."  On information and belief, Cisco asserts that some or all

3    of these products were not in fact factory sealed, but had been opened and modified prior to

4    delivery to customers.

5            1.   **Proof of Further Violations and Illegal Conduct By Defendants**

6            a.   **Sale of Counterfeit Switch in April 2016**

7        35.   An investigator engaged by Cisco made a purchase from Defendant on or about

8    April 8, 2016, from BecTech Global's online store (www.bectechglobal.com), of a Cisco WS-

9    C2960X-48FPS-L switch.  BecTech advertised the switch as "New (Factory Sealed)" at a steep

10   discount from Cisco's Global List Price:



22       36.   The switch (serial number FCW1841A7BG) was sent by Defendant to the

23   investigator in Berkeley, California, within the Northern District of California.

24       37.   The switch was examined by Cisco engineers, who determined that it was

25   counterfeit.  The product appears to have been originally manufactured as a lower grade product (a

26   WS-C2960X-24PS-L switch) and then modified post-manufacture without Cisco's consent to be

27   sold as a more expensive product.  In addition, the label on the outside of the packaging bears a

28   counterfeit Cisco trademark along with the false designation of the higher grade product.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

38.     There are material differences between a WS-C2960X-48FPS-L switch and a WS-C2960X-24PS-L switch.  For example, the power supply specified by Cisco for a WS-C2960X-48FPS-L switch is different from the power supply specified for a WS-C2960X-24PS-L switch.  For the higher functionality switch to use the power supply of a lower functionality part presents potential safety and performance problems as the wattage rating is different (915W, 14.2A as compared to 525W, 7.1A).

**b.   Sale Of Fraudulently-Procured And Materially-Altered Switches in January 2017**

39.     An investigator engaged by Cisco made purchases from Defendant on January 9, 2017 and January 11, 2017.  The January 9 purchase was made from BecTech Global's store on Amazon.com, of a Cisco WS-C2960X-48FPS-L switch.  The switch (serial number FOC2038Y32W) was sent by Defendant to Berkeley, California, within the Northern District of California.

40.     The January 11 purchase was made from Tuksy's store on Amazon.com, for a WS-C2960X-48FPS-L switch.  Tuksy advertised the switch as "New (Factory Sealed)," at a steep discount from Global List Price:



41.     The switch (serial number FCW2048B7CM) was sent by Defendant to El Cerrito, California, within the Northern District of California.

Case No._____

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

42.    Both switches were traced back to high discount deals in China, with special discounting provided by Cisco exclusively for the identified end customers in China.  Both of the switches sold by Defendants in January 2017 were delivered in China in December 2016; in other words, they were sold to the Chinese end users at a special discount <u>within a few weeks</u> of Defendant selling them to the Cisco investigator.

43.    In addition, the switches and their packaging sold by Defendant had material alterations.  Genuine Cisco switches are placed in boxes after manufacture and sealed with tape that prominently bears the Cisco trademark.  In addition, genuine Cisco switches include a high quality power cord that is specified by Cisco and has a plug that is compatible with electrical outlets in the country in which the switch is sold, and therefore is established to be safe and proper for use in that country.  The switches sold by Defendants were materially different from Cisco switches sold in the United States as each had a different power cord than the one included by Cisco when it manufactured the product.  Furthermore, in order to switch the power cords, the sealed boxes needed to be opened.  Thus, products were also not "factory sealed" as represented by Defendants.

### c.    <u>Sale of Potentially Stolen Transceivers in April 2016</u>

44.    When the investigator purchased a switch from BecTech Global's online internet store on or about April 8, 2016, he also purchased two SFP-10G-SR transceivers.  The transceivers were represented by BecTech to be "New (Factory Sealed)" at a steep discount from Cisco's Global List Price:



45.    The transceivers (serial numbers JUR190905JF and JUR19100Q8C) were sent by Defendant to the investigator in Berkeley, within the Northern District of California.  Cisco has no

Case No._____
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    sales records for these transceivers, indicating that they possibly were obtained by theft from

2    Cisco.

3        46.    On May 25, 2017, counsel for Cisco sent a letter to Defendant.  Counsel informed

4    Defendant that there were no sales records for the two transceivers, suggesting that they might

5    have been stolen.  On June 14, 2017, counsel for Defendant responded to the letter, but provided

6    no information about who sold the transceivers to Defendant.

7        **d.    Sale of Fraudulently-Procured Transceivers in January 2017**

8        47.    When the Cisco investigator purchased the switch from BecTech's Amazon.com

9    store on January 9, 2017, he also ordered two GLC-LH-SMD transceivers.

10       48.    The transceivers (serial numbers AVJ20283X2L and AVJ20283L63) were sent by

11   Defendant to Berkeley, within the Northern District of California.  Cisco determined that the

12   GLC-LH-SMD transceivers were originally sold to authorized Cisco resellers in China, with

13   special discount pricing for a purported End User in China.

14       49.    In addition, when the Cisco investigator purchased the switch from Tuksy's

15   Amazon.com store on January 11, 2017, he also ordered two SFP-10G-SR transceivers.  Tuksy

16   advertised the transceivers as "New (Factory Sealed)," at a steep discount from Global List Price:



27       50.    The transceivers (serial numbers JUR1919GPC5 and JUR1919F5NE) were sent by

28   Defendant to El Cerrito, within the Northern District of California.  Cisco determined that the

SFP-10G-SR transceivers were originally sold to an authorized Cisco reseller in the United States, with special discount pricing for a purported End User in the United States.  That end user was not Tuksy, but rather a large technology company headquartered in Northern California.

### e. Sale of SMARTnet Contract in April 2016 that Defendant Induced Cisco Authorized Reseller to Sell in Violation of the Authorized Reseller's Contractual Obligations

51.     An investigator engaged by Cisco purchased from Defendant a SMARTnet contract on or about April 11, 2016, for the WS-C2960X-48FPS-L switch that had been purchased on or about April 8, 2016.  Defendant sold the SMARTnet contract to the investigator, who was located in Berkeley, California, within the Northern District of California.  The SMARTnet contract was sold by a Cisco Authorized Reseller in Germany.  On information and belief, Cisco alleges that Defendant was in direct contact with the Authorized Reseller, or purchased the SMARTnet contract through an intermediary, with knowledge that the rogue Authorized Reseller was violating its contractual obligations to Cisco by making the sale.  That Authorized Reseller was terminated as a Cisco Authorized Reseller following this unlawful sale of a SMARTnet contract, as that contract was not sold to an End Customer as is required by the ICPA.

52.     Cisco SMARTnet contracts are intended only for Cisco products that have been procured through the authorized distribution channel.  If a customer desires a SMARTnet contract that is not procured through the authorized distribution channel, that product must be inspected to determine if it is genuine, amongst other inspection points.  This SMARTnet contract sold by Defendant in April 2016 underscores the reason for this policy, as the Cisco switch which Defendant placed under the comprehensive support contract was in fact counterfeit.  If this had been a sale to a customer instead of an investigator, Cisco would have been exposed to the costs of supporting and potentially replacing the counterfeit product.

///

///

///

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# FIRST CLAIM FOR RELIEF

## Federal Trademark Infringement

### (15 U.S.C. § 1114(1)(a))

53.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

54.     The Cisco Marks and the goodwill of the business associated with them are tremendously valuable in the United States and worldwide because they are distinctive and universally associated in the public perception with the highest quality network and communications technology products and services.

55.     Defendant has sold, offered to sell, distributed, and advertised—and continues to sell, offer to sell, manufacture, distribute, and advertise—infringing networking hardware products bearing Cisco Marks.

56.     The differences between Defendant's unauthorized products and genuine Cisco goods are material.  Cisco asserts on information and belief that having all original Cisco components, entitlement to warranty services, and a "clean chain of title" that does not involve fraud, are relevant to consumers' decision about whether, and from whom, to purchase Cisco products.

57.     Defendant's actions have caused, and are likely to continue to cause, confusion, mistake, and deception as to the origin and quality of Defendant's unauthorized products because they are intentionally calculated to mislead the general purchasing public into believing that Defendant's unauthorized products originated from, are associated with, or are otherwise authorized by Cisco.

58.     Upon information and belief, Defendant's infringing actions were committed fraudulently, willfully, and in bad faith, with knowledge of Cisco's exclusive rights to and goodwill in the Cisco Marks, or with willful blindness to the same, and with the intent to cause confusion, to cause mistake and/or to deceive.

59.     Defendant's unauthorized use of the Cisco Marks constitutes trademark infringement of the federally registered Cisco Marks and has caused substantial damage to Cisco

Case No._____

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   and to the reputation and goodwill symbolized by the Cisco Marks in violation of Section 32 of

2   the Lanham Act, 15 U.S.C. § 1114.

3         60.    Defendant's conduct described above, including the unauthorized use of the Cisco

4   Marks in interstate commerce, have directly and proximately caused and unless enjoined, will

5   continue to cause, substantial, irreparable injury to Cisco and to the business and goodwill

6   represented by the Cisco Marks, which leaves Cisco without an adequate remedy at law.

7   **SECOND CLAIM FOR RELIEF**

8   **Federal Trademark Counterfeiting**

9   **(15 U.S.C. § 1114(1)(b))**

10        61.    Cisco incorporates by reference each of the allegations in the preceding paragraphs

11  of this Complaint as though fully set forth here.

12        62.    Defendant has publicly advertised, sold, offered to sell, and distributed counterfeit

13  Cisco products in interstate commerce in direct competition with Cisco and without authorization

14  or consent to use the Cisco Marks but with full knowledge of Cisco's notorious prior rights in

15  those marks.

16        63.    Defendant's counterfeit Cisco products reproduce, counterfeit, copy, and colorably

17  imitate the Cisco Marks or display a spurious designation that is identical with, or substantially

18  indistinguishable from, the Cisco Marks.  Defendant has applied its reproductions, counterfeits,

19  copies, and colorable imitations of the Cisco Marks to labels, prints, and packages intended to be

20  used in commerce upon or in connection with the sale, offering for sale, distribution, or

21  advertising of Defendant's counterfeit products, which is likely to cause confusion, to cause

22  mistake, or to deceive.

23        64.    Defendant's unauthorized use of the Cisco Marks on or in connection with

24  Defendant's counterfeit products was conducted intentionally and with notice and full knowledge

25  that the use was unauthorized by Cisco.  Accordingly, Defendant's actions constitute willful

26  counterfeiting of the Cisco Marks in violation of 15 U.S.C. § 1114(1)(b) and entitling Cisco to

27  treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

28        65.    Defendant's conduct has directly and proximately caused Cisco to suffer damage to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   the valuable Cisco Marks, and other damages in an amount to be proved at trial. Cisco is left

2   without an adequate remedy at law and will continue to be damaged by Defendant's infringing

3   products unless this Court enjoins Defendant from its fraudulent and deceptive business practices.

4   **THIRD CLAIM FOR RELIEF**

5   **Federal Unfair Competition**

6   **(15 U.S.C. § 1125(a))**

7   66.   Cisco incorporates by reference each of the allegations in the preceding paragraphs

8   of this Complaint as though fully set forth here.

9   67.   Defendant's resale of infringing products that are designed to appear identical to

10  genuine Cisco products and thereby employ the same nature, style, look, and color as genuine

11  Cisco products.  Moreover, as alleged above, Defendant sells products that have affixed

12  counterfeit or infringing versions or reproductions of the Cisco Marks to unauthorized products

13  and/or to the packaging, wrapping, etc., in which the infringing products are packaged.  This

14  unauthorized use of the Cisco Marks is likely to cause confusion, to deceive, and to mislead the

15  consuming public into believing that there is some affiliation, connection, or association between

16  Defendant and Cisco and is likely to cause confusion, mistake, or deception as to the origin,

17  source, sponsorship, authorization, approval, or affiliation of Defendants' unauthorized products.

18  68.   Defendants advertise their products as being "new" and "factory sealed."  This is

19  false, as reflected in the purchases of switches in January 2017, which had been opened and

20  repackaged—thus, no longer "factory sealed"—and which had material differences, including but

21  not limited to having non-standard power cords of unknown origin swapped in for the original

22  power cords.

23  69.   Defendant's actions, including the unauthorized use of the Cisco Marks in

24  commerce, constitute false designation of origin, false or misleading descriptions of fact, and false

25  or misleading representations of fact, which have caused, and are likely to continue to cause,

26  confusion, mistake, and deception, as to Defendant's association or affiliation with Cisco, or lack

27  thereof, as well as to the origin, source, and sponsorship of Defendant's unauthorized products, in

28  violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

70.     Defendant, in commercial advertising and promotion, misrepresent the nature, characteristics, qualities, or geographic origin of the Cisco products it sold, by falsely advertising that the infringing goods were genuine Cisco products and that the products were new, "factory sealed," and not disclosing that they are not covered by the manufacturer's warranty.  The false advertising concerned material information that was likely to influence a consumer's purchasing decision.

71.     Defendant's unauthorized and misleading use of the Cisco Marks constitute willful infringement of the Cisco Marks in violation of 15 U.S.C. § 1114(1)(b) and entitling Cisco to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

72.     Defendant's actions described above, including its unauthorized and misleading use of the Cisco Marks in commerce have caused, and unless enjoined, will continue to cause, substantial and irreparable injury to Cisco and to the business and goodwill represented by the Cisco Marks, thereby leaving Cisco without an adequate remedy at law.

## FOURTH CAUSE OF ACTION

### California Common Law Trademark Infringement

73.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

74.     Defendant's use of the Cisco Marks in connection with the marketing and sale of counterfeit and unauthorized "Cisco" products is likely to cause confusion, mistake, and deception as to whether these products are approved of, sponsored by, or somehow affiliated with Cisco.

75.     Defendant's actions constitute common law unfair competition and trademark infringement and have caused Plaintiffs damages in an amount to be determined at trial.

76.     Cisco alleges on information and belief that Defendant has derived and continues to derive substantial revenue and profits from its past and ongoing unfair competition and trademark infringement, arising from its use of the Cisco Marks.

77.     Defendant's actions have caused and, unless restrained by this Court, will continue to cause irreparable injury to Cisco.

///

Case No._____
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

### FIFTH CAUSE OF ACTION

### California Statutory Misleading and Deceptive Advertising,

### Cal. Bus. & Prof. Code § 17500 et seq.)

78.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

79.     Defendant has made false and misleading statements about their relationship and/or association with Cisco.

80.     Defendant also misleadingly advertised its Cisco products as new, and "factory sealed" when in actuality the products were counterfeit, as confirmed by Cisco brand protection engineers, or pre-owned.

81.     Defendant knew that these statements were false or misleading, or with reasonable care, should have known them to be false or misleading.

82.     Defendant's statements have misled, or are likely to mislead, a reasonable consumer into believing that Defendant was selling products as an authorized Cisco reseller, and that the "Cisco" products sold by Defendant are new, original, and eligible for Cisco warranty.

83.     The conduct alleged above constitutes false and misleading advertising, in violation of Section 17500, et seq. of California's Business and Professions Code.

84.     Plaintiffs have suffered loss of money as a result of Defendant's misleading and false advertising.  Defendant has, and will continue to cause, irreparable injury to Plaintiffs, including injury to Plaintiffs' reputation and goodwill. Defendant's activities, unless restrained, will continue to cause further irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.

### SIXTH CLAIM FOR RELIEF

### Inducing Breach of Contract

### (Common Law)

85.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

86.     Under the terms of Cisco's ICPA, Cisco's Authorized Resellers are contractually

1    required to sell Cisco products and service contracts only to End Users.  On information and

2    belief, Defendant is aware of these contractual obligations.

3    　　　　　87.　　　Cisco is informed and believes, and on that basis alleges, that Defendant has

4    intentionally caused Cisco's Authorized Resellers to breach their contracts with Cisco, including

5    the ICPA, by causing Cisco's Authorized Resellers to sell Cisco products and service contracts to

6    them, rather than to End Users.  Cisco is further informed and believes, and on that basis alleges,

7    that Defendant directly induced Cisco's Authorized Resellers to breach their agreements with

8    Cisco by making material misrepresentations to Cisco in order to obtain special discount pricing

9    on Cisco service contracts and products when Defendants were not entitled to such pricing, and if

10   Defendant was not aware of the specifics of the fraud, was reckless in making the purchases of the

11   products when it was reasonably on notice that there was a high likelihood that the products had

12   been procured by fraud.

13   　　　　　88.　　　As a direct and proximate result of Defendant's intentional inducements of

14   breaches of the ICPA identified herein, Cisco has suffered and will continue to suffer direct,

15   consequential and other damages, including but not limited to, out-of-pocket expenses related to

16   services provided on unauthorized Cisco products, in an amount to be determined at trial in excess

17   of $75,000.

18   　　　　　　　　　　　　**SEVENTH CLAIM FOR RELIEF**

19   　　　　　　　　　　　　　　　**Conversion**

20   　　　　　　　　　　　　　**(Common Law)**

21   　　　　　89.　　　Cisco incorporates by reference each of the allegations in the preceding paragraphs

22   of this Complaint as though fully set forth here.

23   　　　　　90.　　　On information and belief, Defendant's co-conspirators, acting on behalf of

24   Defendant, intentionally took possession of Cisco products and services, by wrongful acts, as

25   described herein, including obtaining Cisco products for which Cisco granted special discounts for

26   specified end customers in China and elsewhere, but which actually were delivered to Defendant

27   without Cisco's knowledge.  Cisco did not consent to Defendant's co-conspirators' possession of

28   these products at the discounted prices for resale to Defendant.  Cisco would not have approved

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR

SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   the special discounts if Cisco knew that the products were not intended to be sold to the identified

2   end customers in China and elsewhere, but instead were intended to be diverted to Defendant, who

3   would then sell them for a windfall profit on the secondary market.  Defendant and its co-

4   conspirators fraudulently concealed these acts in a manner that prevented Cisco from discovering

5   them.

6         91.     As a proximate result of Defendant's acts of conversion, Cisco has lost valuable

7   product that was shipped to Defendant's co-conspirators, which Cisco would not have sold to

8   Defendant's co-conspirators, and the companies they purported to represent, at substantial

9   discounts but for Defendant's and Defendant's co-conspirators ' fraudulent conduct.

10         92.     But for Defendant's acts of conversion, Cisco would have maintained control of

11   their products and would have fully profited from the sale of them.

12         93.     Defendant intentionally and substantially interfered with Cisco's property by taking

13   possession of the products that were obtained by fraud by co-conspirators, either by knowing

14   about the fraudulent taking or ignoring red flags that the property had been stolen though fraud

15   schemes.

16         94.     Cisco did not consent to the theft by deception.

17         95.     Defendant's actions have caused and, unless restrained by this Court, will continue

18   to cause irreparable injury to Cisco.

19         96.     Defendant's conduct was a substantial factor in causing Cisco's harm.

20         97.     The aforementioned conduct of Defendant was willful, malicious, fraudulent and

21   oppressive.  Plaintiffs are therefore entitled to an award of punitive damages.

## EIGHTH CLAIM FOR RELIEF

### California Unfair Competition

### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

25         98.     Cisco incorporates by reference each of the allegations in the preceding paragraphs

26   of this Complaint as though fully set forth here.

27         99.     California Business and Professions Code §§ 17200 *et seq.* prohibits acts of unfair

28   competition, which includes any unlawful business act or practice.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

100.    Defendant has knowingly, willfully, and unlawfully infringed the Cisco Marks, including through the sale of infringing Cisco networking hardware products in violation of the Lanham Act, 15 U.S.C. § 1114(1).

101.    As a direct, proximate, and foreseeable result of Defendant's sale of infringing Cisco networking hardware parts, Cisco has further been deprived of lost revenue and payments, and has therefore sustained injury in fact.

102.    Upon information and belief, due to Defendant's unlawful conduct, Defendant has caused and induced its customers to make invalid warranty claims to Cisco, thereby causing Cisco to send those customers replacement parts to which they were not entitled.

103.    Upon information and belief, as a direct, proximate, and foreseeable result of Defendant's conduct, as alleged above, Cisco has lost valuable product that was shipped to Defendant's customers, but to which Defendant's customers were not rightfully entitled, and incurred costs associated with processing the service requests and returns.

104.    Defendant has also sold products that have been stolen from Cisco through discount fraud schemes and other methods.  In doing that, Defendant has caused loss to Plaintiffs. Such conduct violates California Penal Code § 532.

105.    Defendant's practices were unlawful, and constitute unfair competition as defined by Cal. Bus. & Prof. C. §§ 17200 *et seq.*  Defendants' actions have caused and, unless restrained by this Court, will continue to cause irreparable injury to Cisco.

106.    Cisco seeks the full restitution by Defendant that is necessary and according to proof to restore any and all property and monies, including interest, acquired by Defendant, and all costs caused to Cisco as a result of Defendant's unlawful and unfair business practices.

## **PRAYER FOR RELIEF**

WHEREFORE Cisco respectfully prays for the following relief:

A.    For entry of judgment in favor of Cisco and against Defendant on each of Cisco's claims for relief alleged in this Complaint;

B.    For a preliminary and permanent injunction restraining Defendant, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in

1 interest, and those persons in active concert or participation with them, from (i) further acts of

2 infringement of the trademarks at issue in this litigation, including inducing or contributing third

3 parties to infringe, (ii) further acts of inducing third parties to breach their contracts with Cisco,

4 (iii) further acts of conversion, and (iv) further acts of unfair competition and/or false advertising

5 against Cisco.

6       C.     For a determination that Defendant's acts of trademark infringement constitute

7 cases of willful and exceptional infringement;

8       D.     For actual damages as a result of Defendant's unlawful conduct, alleged above, as

9 well as any profits that are attributable to the alleged conduct and are not taken into account in

10 computing Cisco's actual damages;

11       E.     For maximum statutory damages available under the law to the extent Cisco elects

12 statutory damages for any claim for relief;

13       F.     For punitive damages to the fullest extent available under the law;

14       G.     For reasonable attorneys' fees to the fullest extent available under the law;

15       H.     For treble and/or enhanced damages to the fullest extent available under the law;

16       I.     For full restitution, including restoration of all property unlawfully taken from

17 Cisco, as well as any ill-gotten gains from the resale of Cisco's property;

18       J.     For prejudgment interest and the costs of prosecuting these claims to the fullest

19 extent available under the law;

20       K.     For any additional injunctive, specific performance, and/or other provisional

21 remedies, as appropriate; and,

22       L.     For such other and further relief as the Court deems just and proper.

23 DATED: January 22, 2018         SIDEMAN & BANCROFT LLP

24

25          By:     /s/ Richard J. Nelson

26          Richard J. Nelson
         Attorneys for Plaintiffs

27          Cisco Systems, Inc. and Cisco Technology, Inc.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## **JURY DEMAND**

Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. Proc. 38, Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.  hereby demand a trial by a jury on all issues herein so triable.

DATED: January 22, 2018                    SIDEMAN & BANCROFT LLP


By:      /s/ Richard J. Nelson
         Richard J. Nelson
         Attorneys for Plaintiffs
         Cisco Systems, Inc. and Cisco Technology, Inc.

2835-224\3309836

Case No._____
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

EXHIBIT A



### INDIRECT CHANNEL PARTNER AGREEMENT

**To register as an Indirect Channel Partner with Cisco, your company must accept the terms and conditions of this Indirect Channel Partner Agreement (the "Agreement"). This Agreement applies to all "Registered Partners", as defined in Part A below.**

This Agreement is entered into by and between the company you identified in the applicable Partner Registration Application ("**Registered Partner**") and Cisco. For purposes of this Agreement, Cisco is defined as follows:

- If Registered Partner's principal place of business is located in Canada, "**Cisco**" is defined as Cisco Systems Canada Co., a Canadian corporation having its principal place of business at 88 Queens Quay West, Suite 2900, Toronto, Ontario, M5J 0B8, Canada.

- If Registered Partner's principal place of business is located in China (excluding Hong Kong, Macau and Taiwan), for innovative businesses categories offered by Cisco (China) Innovation Technology co., Ltd., "**Cisco**" is defined as Cisco (China) Innovation Technology Co., Ltd., a company organized and existing under the laws of China having its registered address at Room 303, No. 79, Wan Bo Er Road, Nan Cun town, Panyu District, Guangzhou, Guangdong Province, China. If Registered Partner's principal place of business is located in China (excluding Hong Kong, Macau and Taiwan), for Products and Services offered by Cisco China Company, Limited, "**Cisco**" is defined as Cisco China Company, Limited, having its principal place of Building No.3, 19 and 20 Floor, Wangjiang International Center, Shangcheng District, Hangzhou City, China.

- If Registered Partner's principal place of business is located in Japan, "**Cisco**" is defined as Cisco Systems G.K., a Japanese corporation having its principal place of business at 9.7.1, Akasaka, Minato-ku, Tokyo 107-6227, Japan.

- If Registered Partner's principal place of business is located in Latin America (excluding Brazil) or the Caribbean or the United States of America (the "United States"), "**Cisco**" is defined as Cisco Systems, Inc., a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California 95134, United States.

- If Registered Partner's principal place of business is located in Brazil, for Products and Services offered by Cisco Systems, Inc. in the Territory, "**Cisco**" is defined as Cisco Systems, Inc., a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California 95134, United States. If Registered Partner's principal place of business is located in Brazil, for Products and Services offered by Cisco Comércio e Serviços de Hardware e Software do Brasil Ltda. in the Territory, "**Cisco**" is defined as Cisco Comércio e Serviços de Hardware e Software do Brasil Ltda., a limited liability company organized under the laws of Brazil having its principal place of business at CENU – West Tower, 2nd Floor, Suite 1, Av. das Nações Unidas 12901, Brooklin Novo, São Paulo – SP, Brazil, 04578-000.

- If Registered Partner's principal place of business is located in India, the Netherlands, or Republic of Korea, "**Cisco**" is defined as Cisco Systems International B.V., a corporation organized under the laws of the Netherlands having its principal place of business at Haarlerbergpark, Haarlerbergweg 13-19, 1101 CH, Amsterdam, the Netherlands.

- If Registered Partner's principal place of business is located in Israel, the Asia Pacific region (excluding Australia, China, India, Republic of Korea, and Japan), or the Middle East, Africa, Central and Eastern Europe (excluding Switzerland, the Netherlands, the Russian Federation and the member states of the European Economic Area), "**Cisco**" is defined as Cisco International Limited, a company organized under the laws of the United Kingdom having its principal place of business at 1 Callaghan Square, Cardiff, CF10 5BT, United Kingdom.

This Agreement shall become effective as of the date that Cisco accepts the registration via email to the Registered Partner (the "**Effective Date**").

If Cisco and Registered Partner (together, the "**Parties**") have a Direct Resale Agreement (as defined below) that is in effect as of the day Registered Partner submits this Agreement, or if the Parties subsequently execute a Direct Resale Agreement, to the extent that such Direct Resale Agreement conflicts with this Agreement, the conflicting terms and conditions of the Direct Resale Agreement shall take precedence for the term of the Direct Resale Agreement. If no Direct Resale Agreement exists, this Agreement comprises the complete agreement between the Parties concerning the subject matter herein and replaces any prior oral or written communications between the Parties, all of which are excluded. There are no other conditions, understandings, agreements, representations, or warranties, expressed or implied, which are not specified herein. This Agreement may only be modified by a written document executed by Cisco and Registered Partner, subject to Part B22.5 (Enforceability) below.

### Part A. Definitions.

1. **Added Value** is the non-Cisco component or portion of the total solution which Registered Partner provides to End Users. Examples of Added Value are pre- and post-sales network design, configuration, trouble-shooting, managed services, cloud services, and support and the sale of complementary products and services that comprise a significant portion of the total revenues received by Registered Partner from an End User of Cisco Products. Registered Partner acknowledges that providing financing options and/or network services (unless such network services comprise managed and/or cloud services) to End Users does not constitute Added Value.

2. **Authorized Source** means a distributor that is authorized by Cisco to redistribute Products and Services within the Territory (or within another country of Cisco's choice, in the event that no Cisco-authorized distributor exists within the Territory) to Registered Partner, as they are from time to time identified at http://tools.cisco.com/WWChannels/LOCATR/jsp/distributor_locator.jsp or as otherwise provided by Cisco from time to time. If Registered Partner is a Cisco Learning Partner, **Authorized Source** means a Cisco authorized Learning Partner source, such as Gilmore Global Logistic Services. If Registered Partner enters into this Agreement as a Learning Partner, it is for the sole purpose of purchasing and distributing Cisco's Collaborative Knowledge Product.

3. **Cisco-Branded** means Products or Services bearing a valid Cisco trademark or service mark.

4. **Direct Resale Agreement** means Cisco's System Integrator Agreement, Two-Tier Distributor Agreement or any substantially similar Cisco contract with a different title that authorizes Registered Partner to purchase Products and Services directly from Cisco and Resell them to End Users either directly or indirectly. "Direct Resale Agreement" does not include the Internet Commerce Agreement.

5. **End User** is the final purchaser or licensee that: (i) has acquired Product, managed services, and/or Services for its own Internal Use and not for Resale, remarketing or distribution, and (ii) is identified as such purchaser or licensee by Registered Partner pursuant to Part B.3.1 below.

6. **End User Obligations** means the compliance obligations of End Users when purchasing Services in addition to End User responsibilities set out in the applicable Services Descriptions. The End User Obligations are posted at http://www.cisco.com/go/servicedescriptions.

7. **Internal Use** is any business use of a Product for an End User's or Registered Partner's own internal use; it is to be distinguished from the definition of Resale provided below. For clarification purposes, "internal use" does *not* mean the use of a Product or Service by Registered Partner for the purpose of providing managed or cloud services to an End User.

8. **Marks** means the Cisco Registered Partner logo, the Cisco Certified Partner marks for which Registered Partner qualifies and has been approved by Cisco, and any other Cisco program or certification mark for which Registered Partner qualifies and has been approved by Cisco. "Marks" expressly excludes any other Cisco trademark, service mark, name, or logo. The Marks and the applicable qualification requirements are delineated at Cisco's web site: http://www.cisco.com/go/partnerlogos.

9. **Non-Genuine Products** are any and all products: (i) to which a Mark or other Cisco trademark or service mark has been affixed without Cisco's express written consent; (ii) that have not been manufactured by Cisco or Cisco Technologies, Inc. ("**CTI**") or by a licensed manufacturer of either Cisco or CTI in accordance with the applicable license; (iii) are produced with the intent to counterfeit or imitate a genuine Cisco Product, or (iv) Products where any form of copyright notice, trademark,

logo, confidentiality notice, serial number or other product identifier have been removed, altered, or destroyed.

10. **Products** means the Cisco hardware products, Software, and related documentation which Cisco makes available to Registered Partner through an Authorized Source for Resale (or, in the case of Software, license grant to use such Software).

11. **Professional Services** means any pre- or post-sale services performed by Registered Partner for an End User, excluding training on Cisco Products, which provides Added Value for Cisco Products. Such services include without limitation pre- and post-sales network design, configuration, trouble-shooting, management (remote/virtual or on premise), and support on Cisco Products.

12. **Professional Service Providers** are Registered Partners that wish to provide their own pre- and/or post-sales Professional Services to End Users.

13. **Registered Partner** means Professional Service Providers and/or Resellers (including managed services / cloud providers) that have registered using the Cisco Partner Registration Tool and accepted the terms and conditions of this Indirect Channel Partner Agreement.

14. **Resale** includes any of the following sales or dispositions of a Product or Service:

    (a) transfer of title (or, for Software, a license conferring the right to use the Software, and, for Services, the entitlement to receive such Services) to the End User of such Product or Service;

    (b) transfer of title (or, for Software, a license conferring the right to use the Software, and, for Services, the entitlement to receive such Services) to a financial intermediary such as a leasing company, even if such leasing company is affiliated with Registered Partner, where the Product or Service is used by an unaffiliated End User; or

    (c) retention of title (or, for Software, a license conferring the right to use the Software, and, for Services, the entitlement to receive such Services) by the Registered Partner, but only where the Product or Service is deployed to facilitate the provision by the Registered Partner of hosting, outsourcing, managed services, cloud services, or any other provisioned services for the use of End Users who are not affiliated with the Registered Partner and who contract with the Registered Partner for the provision of such services.

    In no event shall the term Resale include use of a Product or Service for the provision of network services to the general public. The verb "**Resell**" means to engage in Resale. For clarification purposes, use of a Product or Service by Registered Partner for the purpose of providing managed or cloud services to an End User does not constitute network services.

15. **Reseller** is a Registered Partner that purchases and/or licenses Services and Products from an Authorized Source and Resells them directly to End Users.

16. **Services** means one or more of the Cisco Branded Services and Collaborative Services made available under the Cisco Services Partner Program ("Program"), further described in Attachment A to this Agreement.

17. **Service Description** means the description of Services, as of the purchase date of such Services, to be made available by Cisco, and the terms and conditions under which those Services are provided. Each available Service has its own Service Description, which can be found at http://www.cisco.com/go/cspp/.

18. **Software** is the machine-readable (object code) version of computer programs developed or marketed by Cisco, including firmware and any related documentation.

19. **Territory** means the country identified by Registered Partner in the applicable Partner Registration Application accepted by Cisco.

20. **Unauthorized Cisco Product** means any genuine Cisco Product or Cisco Service that has been purchased or acquired, either directly or indirectly, from any party other than Cisco and/or an Authorized Source or sold to any party other than an End User. Unauthorized Cisco Products do not include Non-Genuine Products.

*Part B. Registered Partner Terms and Conditions.*

1. **Cisco Authorization and Resale Rules.**

   1.1 <u>Cisco Authorization.</u> Subject to the terms and conditions set forth in this Agreement, and during this Agreement's term, as set forth below, Cisco authorizes Registered Partner to purchase and/or license Services and Products only from an Authorized Source, and to Resell and/or redistribute such Services and Products directly to End Users within the Territory. "Within the Territory" means that End Users must deploy the Products and/or receive the Services within the Territory. To assist Registered Partner in its sales and marketing efforts, Registered Partner may also purchase and/or license Services and Products for its purchases of demonstration, evaluation, and lab equipment. Registered Partner may only use such Services and Products for demonstration, evaluation, or lab purposes. Except to the extent permitted by Applicable Law, any Software received with or for such Products may not be distributed further, and, notwithstanding any other provision of this Agreement, all Software for such Products is licensed to Registered Partner solely for its use for demonstration, evaluation, or lab purposes.

   1.2 <u>No Resale Outside the Territory.</u> Registered Partner agrees not to solicit Product or Service orders, engage salespersons, Resell, or establish warehouses or other distribution centers outside of the Territory. For purposes of clarification, Cisco considers the following to be soliciting Product or Service orders outside of the Territory in violation of the Agreement, except as expressly authorized by Cisco in writing in advance: where Registered Partner solicits for Resale or Resells Cisco Product or Services to an End User that is located outside the Territory and otherwise has no meaningful operations in the Territory, even if delivery of the Cisco Product or Service occurs in the Territory.

   1.3 <u>Sales to End Users.</u> Registered Partner certifies that it is acquiring the Products and Services solely for Resale to End Users, in accordance with this Agreement. Registered Partner will not Resell, license, sublicense or distribute Products or Services to other Registered Partners of Cisco Products or Services, whether or not such other Registered Partners are authorized by Cisco or by any other source to Resell or license Products or Services. Notwithstanding the above provisions of this Part B.1.3, Registered Partner may Resell Products or Services to any other Cisco-authorized Registered Partner of Cisco Products or Services in the Territory, provided that such other Registered Partner is purchasing and using such Products or Services strictly as an End User and strictly for its Internal Use in the Territory.

   Registered Partner certifies that it will not misrepresent service coverage to End Users by selling Services to End Users without purchasing service contract coverage for those specified items from an Authorized Source.

   Registered Partner further acknowledges that destroyed, stolen, altered or damaged Products are not entitled to Services, as more fully set forth in Cisco's published non-entitlement policies at http://www.cisco.com/go/warranty, which are expressly incorporated into this Agreement. Altered products include any modification to the product serial number, MAC address, or components.

   1.4 <u>Non-Genuine Products or Unauthorized Cisco Products.</u> Registered Partner may not purchase or Resell Non-Genuine Products or Unauthorized Cisco Products or Resell Services associated with any Non-Genuine Products or Unauthorized Cisco Products.

   If Cisco determines that Registered Partner has Resold and/or redistributed Unauthorized Cisco Products, then Cisco may, at Cisco's sole discretion: (a) audit Registered Partner's purchase and Resale records of Cisco Product and relevant records pursuant to Part B.22.6 and/or (b) invoice Registered Partner for all reasonable costs incurred by Cisco in its performance of the Audit and/or (c) suspend shipments to Registered Partner.

   For all Unauthorized or altered Cisco Products, Cisco reserves the right to deny or withhold any Services on such Products, per the non-entitlement policies referenced above.

   1.5 <u>Renewal of Services.</u>

(a) <u>Sixty (60) Days Prior to Service Contract Expiration Date</u>: At least sixty (60) days prior to the expiration date of a Service contract, Cisco, or its authorized agents, may send Service contract renewal reminder notices to Registered Partner and/or the identified End User, and Registered Partner will either: (i) initiate the Service contract renewal process with the End User and forward to Cisco the completed service contract renewal with a valid purchase order; or (ii) notify Cisco in writing of Registered Partner's intent to <u>not</u> renew the Services.

(b) <u>At the Service Contract Expiration Date</u>: If, upon the expiration date of the Service contract, Registered Partner has not renewed the Services, Cisco or its authorized agents, may contact the End User to arrange for the renewal of such Services with Cisco directly or via another Cisco-authorized Registered Partner.

1.6 <u>Unsupported Products</u>. If Registered Partner elects not to Resell Services at the time of Product purchase or if Product becomes unsupported due for whatever reason at some point subsequent to initial deployment, Registered Partner shall refer End User information, including but not limited to End User name, address and phone number to Cisco within ninety (90) days of Product becoming unsupported and authorizes Cisco to contact the End User for the express purpose of contracting directly for support services for the unsupported Product identified by Registered Partner.

2. **Added Value Requirement.** Each time a Registered Partner Resells Services or Products to an End User, Registered Partner will include its Added Value. Registered Partner must be able to demonstrate Products to prospective End Users at the End User's location and make Professional Services available for each Product Resold by Registered Partner.

3. **Registered Partner Obligations.**

3.1 <u>Point of Sale Reports</u>. Registered Partner shall identify the complete name and address of each End User in the applicable Product purchase order issued to the Authorized Source. Additionally, Registered Partner shall identify the complete name and address of each End User in writing within five (5) days of receiving any request from Cisco or the Authorized Source. Registered Partner acknowledges that its provisioning to Cisco of adequate End User information is critical in order for Cisco to provide any applicable warranty and/or other service support, and to verify End User's entitlement to same. Registered Partner's material and unexcused failure to timely provide such End User information may be grounds for Cisco's termination of this Agreement prior to its expiration. Additionally, Registered Partner must comply with any other point of sale reporting requirements published by Cisco from time to time, and/or the Authorized Source(s) from which such Registered Partner purchases and/or licenses Services and Products.

3.2 <u>Agreements with an Authorized Source</u>. Registered Partner acknowledges that each Authorized Source may require Registered Partner to enter into other agreement/s with an Authorized Source. Registered Partner acknowledges and accepts that each Authorized Source is an independent party who is not empowered to act on behalf of Cisco or bind or represent Cisco in any manner. Therefore, such agreement/s will be considered executed only between Registered Partner and each Authorized Source with which Registered Partner has entered into such agreements, except to the extent that such agreements specifically identify Cisco as a third party beneficiary of such agreements. For the avoidance of doubt, this Agreement shall not constitute a sale, purchase or distribution agreement with Cisco. Any arrangements between the Registered Partner and an Authorized Source with respect to the sale, purchase or distribution of Cisco Products and/or Services will need to be defined in separate, specific agreements between Registered Partner and each Authorized Source selected by Registered Partner.

3.3 <u>Additional Requirements</u>. Registered Partner acknowledges that Cisco may require Registered Partner to achieve particular requirements, for example particular specializations, certifications, or training requirements, before permitting any Authorized Source to make available particular Products or Services to Registered Partner. Cisco may require on-going fulfillment of some or all of the requirements to retain the right to purchase, license, Resell or support such Products and Services. Information is available regarding such requirements on the Cisco Channel Partner Program website, located at <u>http://www.cisco.com/go/channelprograms</u>.

Cisco reserves the right, during the term of this Agreement, to license and distribute additional items of Software. Such items of Software may be licensed under additional or different policies and license terms, which will be made available to Registered Partner at the time such items of Software are provided to Registered Partner. Also, Registered Partner acknowledges that Resale of Products and Services to particular End Users with which Cisco has contracted directly (for example, state governments) may require Registered Partner to satisfy additional requirements and to enter into supplemental agreements with Cisco.

3.4     <u>No Stocking of Product</u>.  Registered Partner may not stock Products, and may not order Products without a valid End User purchase order. This Part B.3.4 does not apply to Registered Partners in Japan.

3.5     <u>Due Diligence</u>. Registered Partner must complete any due diligence or other questionnaire provided by Cisco and must comply with such other due diligence or other compliance requirements requested by Cisco in writing.

3.6     <u>Maintenance of Minimum Eligibility Requirements</u>.   Registered Partner must meet and continue at all times to meet the following eligibility requirements:

3.6.1     <u>Existing Cisco User ID</u>:  Registered Partner must have at least one existing Cisco User ID, which will be used to initiate Registered Partner's application for this Agreement. The individual associated to this Cisco User ID must be authorized to sign a legally binding document on behalf of Registered Partner's legal entity. A Cisco User ID can be obtained by going to http://tools.cisco.com/RPF/register/register.do.

3.6.2     <u>Existing Cisco Authorized Distributor Account and Viability</u>:  Registered Partner must have at least one existing and active customer account relationship with a Cisco Authorized Distributor. This Distributor must be physically located or authorized to sell in the country or sales territory where Registered Partner is registering with Cisco. Registered Partner must provide Cisco with all Authorized Distributor(s) and customer account number(s) to validate its intent and ability to purchase and resell though Cisco's Authorized Distribution channel.

3.6.2.1     At time of new Partner registration, Registered Partner must choose and designate a Cisco Authorized Distributor, who will be responsible for engaging with Registered Partner for on-boarding and training purposes. Registered Partner may purchase Products and Services from any Cisco Authorized Source (or Authorized Channel), but must designate an initial distributor for these training purposes.

3.6.2.2     If Registered Partner is approved as a Cisco Registered Partner, Registered Partner must update and maintain its Distributor account information within its Partner profile account at Cisco by using the Cisco Partner Self Service (PSS) or other Cisco-provided Partner Account management tool. Registered Partner may be restricted from purchasing through a Distributor if the information is not provided at the time of registration or is not updated and maintained in the Partner Account profile information at Cisco.

3.6.2.3     If Registered Partner does not have a current account relationship with a Cisco Authorized Distributor, Registered Partner may use the Cisco Authorized Distributor Locator, located at https://tools.cisco.com/WWChannels/LOCATR/openDistributorSearch.do, to contact a Cisco Distributor that will best service its business needs.

3.6.3     <u>Release of Information</u>:  By submitting the Partner registration application and accepting the terms of this Agreement, Registered Partner authorizes the release of its information, including its customer Account Number(s) at the Distributor, Reseller name, and contact information to Cisco and Cisco-authorized third parties, including Cisco Authorized Distributors, to validate Registered Partner's intent and ability to resell and to initiate new partner onboarding, training, and sales

engagement. Registered Partner also indemnifies and holds Cisco and its authorized third parties and Cisco Authorized Distributors harmless for any claim or judicial action whatsoever resulting from the use of such information.

3.6.4 <u>Physical Address in Country</u>: Registered Partner must have at least one physical location within the country in which it is applying for Cisco Partner Registration. The physical location must be Registered Partner's actual business location and not a rented mailbox, a private residence, or a commercial logistics supplier. If approved as a Registered Partner, Registered Partner must list at least one physical location in Cisco's Partner Locator tool.

3.6.5 <u>Business Email Address</u>: Registered Partner must provide a business email address as its primary email address during registration. A business email address does not mean a public domain email address, such as yahoo.com or gmail.com.

3.6.6 <u>Phone Number</u>: Registered Partner must provide and maintain with Cisco, a valid phone number where Registered Partner can be contacted by Cisco.

3.6.7 <u>Company Web Address</u>: Registered Partner must provide and maintain a valid web address for itself.

## 4. **Government Sales.**

4.1 For Government Sales in which Registered Partner's Territory does <u>not</u> include the United States:

4.1.1 <u>Schedule Contracts.</u> Registered Partner shall not, without the express prior written consent of Cisco, distribute or sell, either directly or indirectly, any Products to any agencies, departments or entities (whether or not within the Territory) which either form part of, or are subject to the procurement requirements of, the federal government or any state or municipal government of any of the United States of America (including, for example, but without limitation, embassies, military bases, etc.).

4.1.2 <u>Government Terms.</u> Cisco does not accept any government flow-down provisions, whether for Resale or Internal Use. Further, Cisco will not provide any government-required representations or certifications to Registered Partner or any of Registered Partner's End Users.

Notwithstanding the foregoing, Registered Partner may Resell Products and Services to federal, state, provincial and local governments within the Territory, subject to this Agreement and the applicable Cisco qualification and eligibility requirements, including Cisco's aforementioned disclaimers of supply representations or government flow-downs.

4.2 For Government Sales in which Registered Partner's Territory does include the United States:

4.2.1 <u>Schedule Contracts.</u> With respect to US General Services Administration ("**GSA**"), California Multiple Award Schedule ("**CMAS**"), and other schedule contracts, Registered Partner is prohibited from placing Cisco Products and Services on Registered Partner's GSA, CMAS, or any other schedule contract(s) without the express written approval from an authorized representative of Cisco's Federal Channels organization.

4.2.2 <u>Government Terms.</u> Cisco does not accept any government flow-down provisions, including but not limited to, the United States Government Federal Acquisition Regulations ("**FARs**") and its supplements, Defense FARs, or NASA FARs, whether for Resale or Internal Use. Further, Cisco will not provide any government-required representations or certifications to Registered Partner or any of Registered Partner's End Users.

4.2.3 Registered Partner acknowledges that the Trade Agreements Act, 19 U.S.C. §2511 et seq., and its implementing regulations (collectively, the "**TAA**") limit the

ability of the federal government to purchase items produced outside the United States and certain designated countries. Registered Partner acknowledges that not all Cisco items are produced in the United States or designated countries and that only certain items specifically identified by Cisco ("**Designated Country Items**") are certified as being produced in the United States or designated countries. If Registered Partner undertakes to sell items other than Designated Country Items to the federal government, Registered Partner accepts sole responsibility for ensuring that such sales may be made to the federal government.

4.2.4   Notwithstanding the foregoing, Registered Partner may Resell Products and Services to the U.S. Federal Government within the Territory, subject to this Agreement and enrollment in and meeting the eligibility requirements of the Cisco U.S. Federal Authorization process managed by Cisco's authorized distributors. Registered Partner may contact one of Cisco's authorized distributors for more information on the process.

5.   **Pricing.**

5.1   Registered Partner Prices. The prices Registered Partner pays for Services and Products will be set unilaterally by the Authorized Source from which Registered Partner purchases such Services and Products. Registered Partner is free to unilaterally determine its Resale prices.

5.2   Special Pricing. Any commitment from Cisco to provide special pricing will only occur through the provision of an approved DealID. Unless you are notified in writing, including by email, of the DealID in relation to special pricing, then any other notification of pricing is indicative only, and is not binding upon Cisco.

6.   **Proprietary Rights and Software Licensing.**

6.1   Grant of Rights. Subject to the terms and conditions set forth in this Agreement, Registered Partner's or End User's use or access to Software or SaaS is subject to Cisco's EULA and applicable End User terms (http://www.cisco.com/go/terms). In order to ensure that End User understands that use of the Product is subject to the applicable End User terms (http://www.cisco.com/go/terms), Registered Partner shall provide the applicable End User terms (http://www.cisco.com/go/terms) to each End User as part of the commercial transaction between Registered Partner and End User for the applicable Product, or otherwise prior to End User's access to or use of the Product.

6.2   Rights Reserved by Cisco. Except for the limited license provided to Registered Partner in the preceding Part B.6.1, Cisco reserves all right, title, and interest in and to each proprietary right embedded in or contained in any Product. Registered Partner acknowledges that it shall not sublicense (except as expressly authorized by Cisco in writing), copy Software or Documentation for the benefit of, or distribute any Software or Documentation to, any other person or entity, including, without limitation, other Registered Partners. No 'sale' of any Software is conveyed.

6.3   License Restrictions and Conditions. Registered Partner will not remove, alter, or destroy any form of copyright notice, trademark, logo, or confidentiality notice provided with any Product. Registered Partner will not affix any other mark or name to any Product without Cisco's express written permission. Registered Partner agrees that it will not redistribute Software (including Software received as part of a Product) received from any source other than Cisco or an Authorized Source. Registered Partner will not translate, reverse compile or disassemble the Software, and will transfer to each End User to which Registered Partner Resells Products all applicable and then-in-effect EULA and end-user documentation provided by Cisco and accompanying such Products. Registered Partner shall notify Cisco promptly of any breach or suspected breach of the Cisco license terms or third party license and further agrees that it will, at Cisco's request, assist Cisco in efforts to preserve Cisco's or its supplier's intellectual property rights including pursuing an action against any breaching third parties.

6.4   Non-Cisco Products. If Registered Partner chooses to order from Cisco non-Cisco branded products and/or services that are on the GPL and to be delivered in connection with this Agreement, then such third-party software and/or services along with related documentation

shall be governed by the applicable third party's applicable license and services/support terms. Registered Partner agrees that it shall enter with the third party into such appropriate agreements whose terms shall solely govern the purchase and delivery of these.

7. **Registered Partner Benefits.** Subject to Registered Partner's compliance with its obligations under this Agreement, Registered Partner shall be entitled to the following benefits:

   7.1 <u>Cisco.com Access.</u> Registered Partner shall have partner-level access to the information and tools on the Cisco.com web site (previously referred to as "CCO"), provided Registered Partner's use of such information is subject to the terms and conditions of Cisco.com (including, without limitation, Cisco's software license terms associated with Registered Partner's downloading of any software from Cisco.com) and the Confidentiality obligations of this Agreement set forth in Part B.10 below;

   7.2 <u>Partner Locator Listing.</u> Unless Registered Partner tells Cisco in writing that it may not do so, Cisco may include Registered Partner in the Cisco Partner Locator tool within the Cisco.com web site;

   7.3 <u>Registered Partner Logo.</u> Subject to Part B.9 below, Registered Partner may use the Marks to promote the sale of Products, Services and Professional Services to End Users within the Territory; and

   7.4 <u>Partner E-Learning Access.</u> Registered Partner shall have the right to register on Partner E-Learning Connection, to the extent Cisco makes such service available to Registered Partner within the Territory.

8. **Term and Termination.**

   8.1 <u>Term.</u> This Agreement will expire one (1) year after the date it is accepted by Cisco, unless extended by written agreement of both parties or sooner terminated pursuant to this Agreement.

   8.2 <u>Termination.</u> Within the first thirty (30) days following the Effective Date of this Agreement, either party may terminate this Agreement for convenience with no notice. After the first thirty (30) days following the Effective Date of this Agreement, this Agreement may be terminated for convenience, for any reason or no reason, by either party upon no less than thirty (30) days prior written notice to the other. This Agreement may be terminated by Cisco for cause at any time upon Registered Partner's material breach of the Agreement, on ten (10) days' notice, except that this Agreement may be terminated by Cisco immediately upon Registered Partner's breach of any provision of Parts B.1.2 (No Resale Outside the Territory), B.1.3 (Sales to End Users), B.1.4 (Non-Genuine Products or Unauthorized Cisco Products), B.2 (Added Value Requirement), B.6 (Proprietary Rights and Software Licensing), B.9 (Use of the Marks), B.10 (Confidentiality and Publicity), B.11 (End User License Agreement), B.16 (Export Restrictions and Controls and Import Customs Compliance), B.19 (Compliance with Laws, including Anti-Corruption Laws), B.22.1 (Assignment), B.22.6 (Audit), and where Registered Partner fails to complete any due diligence questionnaire or other questionnaire provided by Cisco and/or to comply with such other due diligence or other compliance requirements requested by Cisco in writing and/or to meet Cisco's general due diligence requirements.

   8.3 <u>Effect of Termination.</u> Upon the termination or expiration of this Agreement, Registered Partner's rights to purchase Services and Products from any Authorized Source shall immediately terminate, Cisco shall discontinue all Registered Partner benefits listed in Part B.7 above, and Registered Partner shall immediately (a) cease to represent itself as a Cisco Registered Partner, and (b) cease its use of any of the Marks.

9. **Use of the Marks.**

   9.1 During the term of this Agreement, and subject to all other terms and conditions of this Agreement, Cisco grants to Registered Partner a nonexclusive, nontransferable, royalty-free, personal license to use the Marks in the exact form provided by Cisco in the Territory, solely to promote the Resale of Cisco Products and Services to End Users. Registered Partner agrees and acknowledges that Cisco is the sole owner of the Marks, and that all goodwill arising from use of the Marks shall inure to Cisco's sole benefit. Registered Partner will not

register or seek to register the Marks, or use or adopt any mark, name, domain name or designation that is confusingly similar to the Marks or otherwise violates Cisco's rights in the Marks. Registered Partner also agrees that it will not take any action to challenge or interfere with, directly or indirectly, the validity of the Marks or Cisco's use, ownership, or registration of the Marks.

9.2 Registered Partner shall not affix the Marks or any other Cisco trademark or name to any product. Registered Partner agrees that it will not use the Marks or any other Cisco marks or names in anyway not expressly authorized by Cisco in writing. Registered Partner's use of the Marks shall conform to the Program Guidelines and Qualifications located at http://www.cisco.com/go/partnerlogos and Cisco's Trademark, Copyright, and other usage Policies provided at: http://www.cisco.com/go/logo (jointly referred to as the "**Guidelines**"), which are incorporated into this Agreement by this reference. Cisco reserves the right to modify the Guidelines from time to time, and will provide notice of such updates by posting on the above referenced web pages. Registered Partner shall cooperate with Cisco's requests to confirm Registered Partner's compliance with the current Guidelines and the terms of this Agreement. Registered Partner shall comply promptly with any request by Cisco that Registered Partner modify, correct or cease any non-complying use of the Marks.

9.3 Upon termination or expiration of this Agreement, Registered Partner agrees to cease immediately all use of the Marks. Registered Partner also shall cease immediately holding itself out as a Registered Partner of Cisco products or implying an association or affiliation with Cisco.

9.4 <u>Non-Genuine Products</u>

9.4.1 Registered Partner shall not acquire, use, promote or Resell Non Genuine Products. Registered Partner will not remove, alter, or destroy any form of copyright notice, trademark, logo, confidentiality notice, serial number or other product identifier provided with any Product.

9.4.2 If Registered Partner acquires, uses, promotes or Resells Non-Genuine Products (other than from an Authorized Source), Cisco may take one or more of the following actions, at Cisco's discretion: (i) require Registered Partner, within ten days of Cisco's request, to recall and destroy all Non-Genuine Products that Registered Partner has sold to End Users or used in the provision of a managed/cloud service and replace such products with legitimate, equivalent Products, at Registered Partner's expense (or reimburse Cisco for the cost of such replacement, if Cisco makes the replacement), (ii) require Registered Partner, within five days of receiving written request, to provide Cisco with all details related to Registered Partner's acquisition of all Non-Genuine Products, including without limitation, its suppliers, shipping details and all buyers to whom Registered Partner resold Non-Genuine Products; (iii) decline the provisioning of any kind of service support for such Non-Genuine Products; and/or (iv) immediately terminate this Agreement pursuant to Part B.8 (Term and Termination).

10. **Confidentiality and Publicity.** In the event that either Party receives from the other Party information that is marked as confidential, the receiving Party shall protect that information using the same degree of care as it uses to protect its own sensitive business information, but not less than a reasonable degree of care, and shall not disclose such information to any third party without the disclosing Party's prior written consent. Registered Partner shall only use Cisco's confidential information in connection with the promotion and Resale of Products and Services. Upon the termination or expiration of this Agreement, each Party will promptly return or destroy any confidential information provided by the other Party. Except as expressly provided in this Agreement, neither Cisco nor Registered Partner will issue press releases or make other public announcements that identify Registered Partner as an authorized or registered Cisco Channel Partner without the express written consent of the other party. In addition, Registered Partner shall at no time (nor cause any third party to) take any action, publish or otherwise communicate anything which is or may be detrimental to the business reputation of Cisco.

11. **End User License Agreement. ALL SOFTWARE MADE AVAILABLE TO REGISTERED PARTNER, INCLUDING BUT NOT LIMITED TO THE SOFTWARE DOWNLOADED VIA CISCO.COM AND ANY SOFTWARE ACQUIRED THROUGH AN AUTHORIZED SOURCE,**

EITHER WITH HARDWARE OR SEPARATELY, IS SUBJECT TO THE CISCO END USER LICENSE AGREEMENT <u>UNLESS THE SOFTWARE IS BRANDED BY A THIRD-PARTY AND A THIRD-PARTY LICENSE ACCOMPANIES THE SOFTWARE (EITHER IN HARDCOPY OR ELECTRONIC FORMAT)</u>. REGISTERED PARTNER'S RIGHTS AND RESPONSIBILITIES WITH RESPECT TO ANY THIRD-PARTY BRANDED SOFTWARE SHALL BE GOVERNED BY THE LICENSOR'S APPLICABLE SOFTWARE LICENSE. The Cisco End User License Agreement may be found at: http://www.cisco.com/go/terms.

Information made available to Registered Partner through Cisco.com is made available subject to the terms contained in the Cisco.com Terms and Conditions and any additional terms as Cisco may notify Registered Partner of through Cisco.com. Information provided through Cisco.com may be used only in connection with Registered Partner's promotion and Resale of Products and Services.

12. **Limited Warranty / Warranty Disclaimer.**

12.1   <u>Warranty.</u> The warranty for Cisco-Branded Products will be provided by Cisco with the Product, or, if no written warranty statement is provided, the Limited Warranty Statement for Cisco-Branded Products is available at the following URL: http://www.cisco.com/go/warranty.

PRODUCTS THAT ARE NOT BRANDED BY CISCO WITH THE CISCO TRADEMARK OR SERVICE MARK ARE NOT COVERED BY THE CISCO WARRANTY REFERENCED ABOVE. INSTEAD, SUCH THIRD-PARTY PRODUCTS MADE AVAILABLE WITH CISCO PRODUCTS AND SOLUTIONS, INCLUDING BUT NOT LIMITED TO THE UNIFIED COMPUTING SYSTEMS ("UCS") SOLUTION, SHALL BE COVERED BY THEIR OWN MANUFACTURER'S WARRANTY.

12.2   <u>Disclaimer.</u> EXCEPT AS SPECIFIED IN THE LIMITED WARRANTY STATEMENT SPECIFIED IN PART B.12.1 ABOVE, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS OR WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTIBILITY, FITNESS FOR A PARTICULAR PURPOSE (EVEN IF KNOWN TO CISCO), NONINFRINGEMENT, SATISFACTORY QUALITY OR ARISING FROM A COURSE OF DEALING, LAW, USAGE, OR TRADE PRACTICE ARE HEREBY EXCLUDED TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW. TO THE EXTENT AN IMPLIED WARRANTY CANNOT BE EXCLUDED, SUCH WARRANTY IS LIMITED TO THE 90-DAY PERIOD PROVIDED IN THE LIMITED WARRANTY STATEMENT SPECIFIED IN PART B.12.1 ABOVE. THIS DISCLAIMER AND EXCLUSION SHALL APPLY EVEN IF THE EXPRESS WARRANTY SET FORTH ABOVE FAILS OF ITS ESSENTIAL PURPOSE.

REGISTERED PARTNER SHALL NOT MAKE ANY WARRANTY COMMITMENT BEYOND THE LIMITED WARRANTY REFERENCED IN PART B.12.1 ON CISCO'S BEHALF. REGISTERED PARTNER AGREES TO INDEMNIFY CISCO AND HOLD CISCO HARMLESS FROM ANY WARRANTY MADE BY REGISTERED PARTNER BEYOND THE LIMITED WARRANTY REFERENCED IN PART B.12.1.

13. **Patent, Copyright, and Trademark Infringement Indemnification**

13.1.   Claims. Cisco will defend any claim against Registered Partner that a Cisco-Branded Product provided under this Agreement infringes third party patents, copyrights, or registered trademarks (the "Claim") and will indemnify Registered Partner against the final judgment entered by a court of competent jurisdiction or any settlements arising out of a Claim.

13.2.   Registered Partner will:

13.2.1.   Promptly notify Cisco in writing of the Claim (or threat thereof), and any subsequent litigation updates; and

13.2.2.   Cooperate with Cisco in the defense of the Claim (including any statements to third parties regarding the Claim), and grant Cisco full and exclusive control of the defense and settlement of the Claim and any subsequent appeal.

If Registered Partner fails to notify Cisco promptly of the Claim, and that failure prejudices Cisco's ability to defend, settle or respond to the Claim, then Cisco's obligation to defend or indemnify Registered Partner with respect to that Claim will be reduced to the extent Cisco has been prejudiced. In addition, such failure to provide prompt notification shall relieve Cisco of any obligation to reimburse for Registered Partner's attorneys' fees incurred prior to notification.

13.3.   Additional Remedies. If a Claim is made or appears likely, Registered Partner agrees to permit Cisco to procure for Registered Partner the right to continue using the Cisco-Branded Product, or to replace or modify the Cisco-Branded Product with one that is at least functionally equivalent. If Cisco determines that none of those alternatives is reasonably available, then Registered Partner will return the Cisco-Branded Product and Cisco will refund Registered Partner's remaining net book value of the Cisco-Branded Product calculated according to generally accepted accounting principles.

13.4.   Exclusions. Cisco has no obligation for any Claim based on:

13.4.1.   Compliance with any designs, specifications, requirements, or instructions provided by Customer or a third party on Registered Partner's behalf;

13.4.2.   Modification of a Cisco-Branded Product by Registered Partner or a third party;

13.4.3.   The amount or duration of use made of the Cisco-Branded Product, revenue earned by Registered Partner, or services offered by Registered Partner to external or internal customers; or

13.4.4.   Combination, operation, or use of a Cisco-Branded Product with non-Cisco products, software, or business processes.

13.5.   Sole and Exclusive Remedy. This Part B.13 states Cisco's entire obligation and Registered Partner's exclusive remedy regarding any claims for intellectual property infringement.

14.   **Limitation of Liability and Consequential Damages Waiver.** The limits of liability for this Agreement are set forth as follows:

14.1   If this Agreement is governed by California, Japanese, Brazilian, or Canadian law, as set forth in Part B.21, below, the following Sections B.14.1.1 and B.14.1.2 will apply:

14.1.1   **Limitation of Liability.** NOTWITHSTANDING ANYTHING ELSE HEREIN, AND EXCEPT FOR LIABILITY ARISING OUT OF 1) REGISTERED PARTNER'S BREACH OF PART B, SECTION 6 (PROPRIETARY RIGHTS AND SOFTWARE LICENSING) OR PART B, SECTION 11 (END USER LICENSE AGREEMENT) OF THIS AGREEMENT, 2) AMOUNTS DUE FOR PRODUCTS AND SERVICES PURCHASED OR SOFTWARE USED OR TRANSFERRED WITH RESPECT TO THE PAYMENT OF WHICH NO BONA FIDE DISPUTE EXISTS, OR 3) CLAIMS OF FRAUD, ALL LIABILITY OF EACH PARTY AND ITS SUPPLIERS UNDER THIS AGREEMENT OR OTHERWISE SHALL BE LIMITED TO THE MONEY PAID BY REGISTERED PARTNER TO ANAUTHORIZED SOURCE UNDER THIS AGREEMENT DURING THE SIX (6) MONTH PERIOD PRECEDING THE EVENT OR CIRCUMSTANCES GIVING RISE TO SUCH LIABILITY. THIS LIMIT SHALL NOT APPLY TO LIABILITY FOR DEATH OR BODILY INJURY RESULTING DIRECTLY FROM THE NEGLIGENCE OR WILLFUL MISCONDUCT OF CISCO, OR FROM DAMAGE TO TANGIBLE PERSONAL PROPERTY (EXCLUDING LIABILITY FOR LOST DATA) RESULTING DIRECTLY FROM THE RECKLESSNESS OR WILLFUL MISCONDUCT OF CISCO. ALL LIABILITY UNDER THIS AGREEMENT IS CUMULATIVE AND NOT PER INCIDENT.

14.1.2   **Waiver of Consequential Damages.** EXCEPT FOR LIABILITY ARISING OUT OF OR IN CONNECTION WITH BREACH OF PART B, SECTION 6 (PROPRIETARY RIGHTS AND SOFTWARE LICENSING) ORPART B, SECTION 11 (END USER LICENSE AGREEMENT) OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR THEIR RESPECTIVE SUPPLIERS BE

**LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, OR LOST REVENUE, LOST PROFITS, OR LOST OR DAMAGED DATA, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF.**

14.2   If this Agreement is governed by the laws of England, as set forth in Section B.21 below, the following Sections B.14.2.1 and B.14.2.2 will apply:

14.2.1   Limitation of Liability.

14.2.1.1   Nothing in this Agreement shall limit Cisco's or its suppliers' liability to Registered Partner for (1) bodily injury or death caused by its negligence or (2) Cisco's liability in the tort of deceit.

14.2.1.2   The aggregate total liability of Cisco and its suppliers shall be limited to the higher of (i) Ten Thousand United States Dollars ($10,000 USD), or (ii) money paid by Registered Partner to the Authorized Source under this Agreement in the twelve (12) month period prior to the event or circumstances giving rise to the liability.   All liability under this Agreement is cumulative and not per incident.

14.2.1.3   Nothing in this Agreement shall limit Registered Partner's liability to Cisco for (1) bodily injury or death caused by its negligence or (2) Registered Partner's liability to Cisco in the tort of deceit.

14.2.1.4   Except for liability arising out of 1) Registered Partner's breach of obligations set forth in Part B, Section 6 (Proprietary Rights and Software Licensing)or Part B, Section 11 (End User License Agreement) of this Agreement, 2) amounts due for products and services purchased with respect to the payment of which no bona fide dispute exists, or 3) claims of fraud, the aggregate total liability of Registered Partner shall be limited to the greater of (a) money paid by Registered Partner to the Authorized Source under this Agreement in the twelve (12) month period prior to the event or circumstances giving rise to the liability or (b) amounts due for products and services purchases with respect to the payment of which no bona fide dispute exists. All liability under this Agreement is cumulative and not per incident.

14.2.2   <u>Waiver of Consequential Damages</u>. EXCEPT FOR LIABILITY ARISING OUT OF OR IN CONNECTION WITH BREACH OF PART B, SECTION 6 (PROPRIETARY RIGHTS AND SOFTWARE LICENSING) ORPART B, SECTION 11 (END USER LICENSE AGREEMENT) OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR THEIR RESPECTIVE SUPPLIERS BE LIABLE FOR ANY OF THE FOLLOWING LOSSES OR DAMAGE (WHETHER SUCH LOSSES WERE FORESEEN, FORESEEABLE, KNOWN, OR OTHERWISE):   LOSS OF USE, INTERRUPTION OF BUSINESS, LOSS OF ACTUAL OR ANTICIPATED PROFITS (INCLUDING LOSS OF PROFIT ON CONTRACTS), LOSS OF REVENUE, LOSS OF THE USE OF MONEY, LOSS OF ANTICIPATED SAVINGS, LOSS OF OPPORTUNITY, LOSS OF GOODWILL, LOSS OF REPUTATION, LOSS OF, DAMAGE TO OR CORRUPTION OF DATA, OR SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF.   SUCH LIABILITIES WILL BE EXCLUSIVELY GOVERNED BY THE SPECIFIC AGREEMENTS BETWEEN REGISTERED PARTNER AND THE AUTHORIZED SOURCE, UNDER WHICH SPECIFIC CISCO PRODUCTS AND/OR SERVICES ARE PURCHASED.

15.   **Third Party Rights.   To the extent permitted by law, no person or entity who is not a party to this Agreement shall be entitled to enforce or benefit from any of this Agreement's terms, including but not limited to doing so under the Contracts (Rights of Third Parties) Act of 1999.**

16. **Export Restrictions and Controls and Import Customs Compliance.**

16.1 **Export Restrictions and Controls.**

16.1.1 <u>Applicability.</u>  Cisco Products, technology, and Services are subject to U.S. and local export control laws and regulations.  The Parties shall comply with such laws and regulations governing use, export, re-export, and transfer of Products and technology and will obtain all required U.S. and local authorizations, permits, or licenses.

Registered Partner agrees not to use any export and/or re-export licenses or authorizations that Cisco or its affiliates hold for securing its own activities unless specifically authorized by Cisco's Global Export Trade and where legally compliant.  Registered Partner agrees to institute and maintain an effective internal export compliance program to ensure compliance with its export and re-export activities.

16.1.2 <u>Government/Military Sales.</u>  Registered Partner hereby certifies that none of the Products, Services, or technical data supplied by Cisco under this Agreement will be knowingly sold or otherwise transferred to, or made available for use by or for, any government or military end-users or in any government or military end-use located in or operating under the authority of any country not identified in Supplement No. 1, Country Group A:1 to Part 740 of the EAR without US or other country's export authorizations.

16.1.3 Registered Partner also certifies that none of the Products, Services or technical data supplied by Cisco under this Agreement will be knowingly sold or otherwise transferred to, or made available for use by or for, any entity that is engaged in the design, development, production or use of nuclear, biological or chemical weapons or missiles or is otherwise restricted from receiving Cisco Products without US or other country's export authorizations.

16.1.4 <u>Trade Data.</u>  Registered Partner may locate ECCN (Export Control Classification Number), HTS (Harmonized Tariff Schedule), French DCSSI Authorization, Encryption Strength, Encryption Status and CCATS (Commodity Classification Automated Tracking System) number at the following URL: http://tools.cisco.com/legal/export/pepd/Search.do.

16.1.5 <u>Record Keeping.</u>  Registered Partner agrees to maintain a record of sales, imports, exports and re-export of Cisco Products, technology, and Services in accordance with the Registered Partner's records retention programs in the appropriate geographies but at least for five years.

16.2 **Import Customs Compliance.**

16.2.1 Registered Partner agrees to comply with Customs import and other trade and tax related laws and regulations ("**Trade laws**") of the United States and other national governments.

16.2.2 Registered Partner agrees to comply with the Trade Agreement Act (TAA), (unless subject to a valid waiver) any time Cisco Products will be sold to an End User that is identified as a US government entity.  For all such orders, Registered Partner agrees to request, via Cisco's ordering tools, that any Product included in the order has a TAA eligible country of origin. Registered Partner also agrees to comply with any similar rules or regulations promulgated by a non-US government that would similarly apply to sales to an entity of that government.

16.2.3 <u>Country of Origin.</u> Country of Origin (CO) shown on Cisco's commercial invoices is determined according to the Worldwide Customs Organization (WCO) non-preferential rules of origin.  For purposes of clarification, the CO shown on any Cisco commercial invoice is based on a non-preferential CO treatment and should not be relied upon as a preferential CO treatment, unless and until written

authorization has been provided by Cisco's Custom's organization. Registered Partner may seek information related to a request to obtain preferential treatment from Cisco's Custom's organization, however, Registered Partner acknowledges that Cisco's Custom's organization has no processes in place to respond or process such requests.

16.2.4 In instances where Cisco is not the importer of record, the provision of Trade Data, in particular the HTS Classifications, is undertaken without liability for errors and omissions contained therein. It remains the responsibility of the Registered Partner to ensure that the correct HTS is applied at the time of importation into the Territory.

16.3 **Obligation.** Registered Partner's obligation under this Article shall survive the expiration or termination of this Agreement.

## 17. Obligation to Maintain Contacts.

17.1 **Requirement to Maintain.** Registered Partners are required to have at least one valid contact associated to their company at all times in the Cisco Channel Partner Database.

17.2 **Valid Contact Information.** For Registered Partner's contacts to be "valid," its contact profiles in Cisco's Channel Partner Database ("CPD"), as maintained via the Partner Self Service ("PSS") data management tool, must include a First Name, Last Name, Site Address, and Email Address. Cisco will remove the Registered Partner from the CPD if the last valid contact associated with the company is removed from the CPD using the PSS tool. To regain Cisco Channel Partner status, a user from the company must complete registration as a new prospective Cisco Channel Partner.

17.3 **Reservation of Rights.** Cisco reserves the right to remove any Registered Partner without sufficient valid contacts at such time, and using such means, as Cisco may determine in its sole discretion. Whereas Cisco may choose, at its option, to provide certain forms of notification regarding the removal of a Registered Partner's status as a result of insufficient or invalid contacts in the PSS, Cisco is not under any obligation to provide notification of any kind regarding any such removal.

17.4 **Effect of Partner Removal.** If Cisco removes the Registered Partner from the CPD in accordance with the foregoing, or Registered Partner's status as a Registered Partner is otherwise removed from the CPD, this Agreement shall terminate concurrently.

## 18. Entitlement. Registered Partner acknowledges that Cisco has the right to verify an End User's entitlement to receipt of Services, and that End User is entitled to receive support services only on Product for which Cisco has been paid the applicable software license and support fees.

18.1 **Services for Unauthorized Cisco Products and Non-Genuine Products.** Non-Genuine Products are not eligible for Cisco service and support. Unauthorized Cisco Products are only eligible for Cisco service and support following an inspection. If it is determined that a Cisco Product has Unauthorized Cisco Products incorporated into it, Cisco reserves the right to withhold support services for that Product until such time as the Product is inspected by Cisco or its designated representative, with any applicable inspection and software licensing fees paid in full.

18.2 **Inspection and Software Relicensing.** Information on Cisco's Inspections and Software Relicensing program and policies can be viewed at the following link: http://www.cisco.com/en/US/prod/hw_sw_relicensing_program.html#~policy.

18.3 **Suspension and Termination of Support Contracts.** If Cisco determines that 1) Registered Partner or Customer does not have a valid license for the Product, 2) the Product was purchased from a source other than an Authorized Source without appropriate inspection and relicensing, or 3) a valid software license for the Product does not exist, Cisco reserves the right to either suspend any support service contract associated with such Products until such time as any applicable inspection is conducted and any applicable relicensing fees are paid for such Products, or to terminate the support service contract (in which event Cisco will provide a pro-rata refund of any paid support service fees for the

remaining period of the support service contract). If Cisco determines that the Product is a Non-Genuine Product, then any associated support service contract will be terminated with immediate effect, and Registered Partner or Customer must immediately return to Cisco any replacement parts or other materials made available in connection with that Non-Genuine Product.

18.4 **Initiation of Product Support.** Technical support is effective immediately upon opening a Cisco service contract. However, Products not under a valid Cisco Warranty at the time a new service contract is initiated will not be eligible for advance replacement service requests until 30 days after the initiation of the service contract.

Registered Partner certifies that it will not initiate or facilitate a service request on a Product (a) in furtherance of or with intent to commit any fraudulent or other illegal activities, or otherwise in violation of any applicable law, regulation, legal agreement, or Cisco's published policies; (b) in a manner that is abusive of Cisco programs or other information in this Agreement or in the Service Description; or (c) for Products that are not on the Registered Partner's valid support contract.

19. **Compliance with Laws, including Anti-Corruption Laws.**

19.1. Cisco requires that all of its suppliers, subcontractors, channel partners, consultants, agents and other parties with whom Cisco does business act at all times in a professional and ethical manner in carrying out their services and contractual obligations to Cisco, or on Cisco's behalf to a Cisco customer or other third party. To that end, Registered Partner must undertake to strictly comply with any and all country, federal, state and local laws, ordinances, codes, regulations, rules, policies and procedures, including, but not limited to, anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act, other anti-bribery laws ("**Applicable Laws**"). Registered Partner can find more information about the FCPA at the following URL: http://www.usdoj.gov/criminal/fraud/fcpa/, or by contacting publicsectorcompliance@cisco.com. Any violation of Applicable Laws in a country and regulations shall represent breach of this Agreement and could results in immediate termination of the business and contractual relationship between the Parties.

19.2. Upon request, Registered Partner may be required to have its own subcontractors, consultants, agents or representatives execute a similar written anti-corruption compliance statement, and to confirm to Cisco that such action has been taken.

19.3. **Registered Partner shall immediately report to Cisco any concerns it may have regarding any business practices by any Cisco employee or other Cisco Registered Partner by emailing ethics@cisco.com, or by calling Cisco's Helpline toll free number in North America 1-877-571-1700 or worldwide number (reverse calling charges to Cisco) 001-770-776-5611.**

20. **Dispute Resolution.**

20.1. **Dispute Resolution.** Cisco and Registered Partner, (together, the "**Parties**", or individually, each a "**Party**") agree that any conflict, dispute, controversy, or claim arising out of or relating to this Agreement or the relationship created by this Agreement, including questions of arbitrability, whether sounding in tort or contract (together or individually a "**Dispute**"), shall be finally resolved in accordance with the following process:

20.2. **Escalation of Disputes**. Subject to Section 20.5 below, the Parties agree to attempt to resolve each Dispute by first escalating the Dispute to their respective business managers. Within fourteen (14) calendar days of written notice of a Dispute, the business managers will meet in person or by phone and work in good faith to resolve the Dispute.

20.3. **Mandatory, Non-Binding Mediation.** Subject to Section 20.5 below, if the Parties are unable to resolve the Dispute in accordance with Section 20.2 above, either Party may initiate a mandatory, non-binding mediation. If Registered Partner is located in the United States, such mediation shall be in accordance with the JAMS mediation procedures then in effect. The JAMS mediation procedures are hereby incorporated by reference into this clause. If Registered Partner is located outside the United States, such mediation shall be in accordance with the London Court of International Arbitration ("**LCIA**") Mediation Procedure then in effect,

unless stated otherwise in this Agreement. The LCIA Mediation Procedure is hereby incorporated by reference into this clause.

The Parties shall share all fees and costs of the mediation proceedings.

All communications made during the course of the mediation by either of the Parties or the mediator are intended to be confidential and privileged to the extent permitted by law.

20.4. **Binding Arbitration.** SUBJECT TO SECTION 20.5 BELOW, IF THE PARTIES ARE UNABLE TO RESOLVE THE DISPUTE THROUGH THE MEDIATION PROCESS WITHIN SIXTY (60) CALENDAR DAYS OF THE APPOINTMENT OF THE MEDIATOR, OR SUCH FURTHER PERIOD AS THE PARTIES SHALL AGREE TO IN WRITING, THE DISPUTE SHALL BE REFERRED TO AND FINALLY RESOLVED BY BINDING ARBITRATION. IF REGISTERED PARTNER IS LOCATED IN THE UNITED STATES, SUCH ARBITRATION SHALL BE IN ACCORDANCE WITH THE JAMS ARBITRATION RULES THEN IN EFFECT, WHICH ARE HEREBY INCORPORATED BY REFERENCE INTO THIS CLAUSE. IF REGISTERED PARTNER IS LOCATED OUTSIDE THE UNITED STATES, SUCH ARBITRATION SHALL BE IN ACCORDANCE WITH THE LCIA ARBITRATION RULES THEN IN EFFECT, WHICH ARE HEREBY INCORPORATED BY REFERENCE INTO THIS CLAUSE.

The arbitration tribunal shall consist of a sole arbitrator, selected in accordance with the LCIA arbitration rules if Registered Partner is located outside the United States, or in accordance with the JAMS arbitration rules if Registered Partner is located in the United States. The arbitrator shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the Parties an adequate opportunity to discover relevant information regarding the subject matter of the Dispute.

Cisco shall pay all fees and costs of the arbitration proceedings. After the arbitrator issues the written award, however, the prevailing Party may apply to the arbitrator for recovery of all reasonable costs and expenses associated with the arbitration, including, but not limited to, the fees of the arbitrator, administrative fees, and reasonable attorneys' fees. Such costs and expenses will be awarded at the arbitrator's discretion.

Notwithstanding anything to the contrary, the arbitrator shall exceed his or her powers if the arbitrator awards damages inconsistent with the Limitation of Liability and Consequential Damages Waiver provisions set forth in Section B.14.1 (Limitation of Liability), and Section B.14.2 (Consequential Damages Waiver). The Parties irrevocably waive the award of any such damages.

The language to be used in the arbitration shall be English.

20.5. **Preliminary Relief.** At any point after a Dispute has arisen, in the event interim or provisional relief is necessary to protect the rights or property of a Party under Sections B.1.4 and B.10 of this Agreement or otherwise prior to the resolution of the Dispute, either Party may, without waiving any process or remedy under this Agreement, seek such relief from any court of competent jurisdiction.

21. **Choice of Law and Venue.** The venue for the dispute resolution processes set forth above, and the validity, interpretation, and enforcement of this Agreement shall be governed as follows:

21.1 If Registered Partner's principal place of business is located in Canada, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of the Province of Ontario and the laws of Canada applicable as if performed wholly within the province and without giving effect to principles of conflicts of laws. The Parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement. The seat of mediation and arbitration shall be in the Province of Ontario unless otherwise agreed by the Parties.

21.2 If Registered Partner's principal place of business is located in China, the validity, interpretation, and performance of this Agreement shall be controlled by and construed under the laws of the People's Republic of China. Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be

referred to and finally resolved by arbitration at China International Economic and Trade Arbitration Commission in Beijing, the People's Republic of China ("CIETAC"), in accordance with the Arbitration Rules of CIETAC for the time being in force, which rules are deemed to be incorporated by reference in this section. The arbitration tribunal shall be made up of three (3) arbitrators. Cisco and Distributor shall each appoint one (1) arbitrator and the third arbitrator shall be appointed by agreement between the Parties. In the event that the Parties cannot agree on the nomination of the third arbitrator within fourteen (14) days of the CIETAC accepting the case, the third arbitrator, who shall serve as the presiding arbitrator, shall be appointed by the president of CIETAC, provided that such appointee shall not be a United States or Chinese national (including Hong Kong, Macau or Taiwan permanent residents). The language of the arbitration shall be in English. The arbitral award shall be final and binding upon both parties. Notwithstanding the foregoing, either party may seek injunction in any court of appropriate jurisdiction with respect to any alleged breach of such party's intellectual property, proprietary rights or the confidentiality obligations stated herein.

21.3   If Registered Partner's principal place of business is located in Japan, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of Japan, without giving effect to principles of conflicts of laws. The seat of mediation and arbitration shall be in Tokyo, unless otherwise agreed by the Parties.

21.4   If Registered Partner's principal place of business is located in Latin America, the Caribbean, or the United States, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of the State of California, United States of America, as if performed wholly within the State and without giving effect to principles of conflicts of laws. The Parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement. The seat of mediation and arbitration shall be in San Francisco, California, unless otherwise agreed by the Parties.

21.5   If Registered Partner's principal place of business is located in the Asia Pacific region (excluding Australia, China and Japan), the Middle East (excluding Israel), Africa, Central and Eastern Europe (excluding member states of the European Economic Area), Russia and the Commonwealth of Independent States (CIS), or Israel, the validity, interpretation, and enforcement of this Agreement shall be governed by the laws of England, without giving effect to principles of conflicts of laws. The Parties specifically disclaim the UN Convention on Contracts for the International Sale of Goods. The seat of mediation and arbitration shall be in London, England, unless otherwise agreed by the Parties.

21.6   If Registered Partner's principal place of business is located in Brazil, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of Brazil, without giving effect to principles of conflicts of laws. The Parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement. The seat of mediation and arbitration shall be in San Francisco, California, unless otherwise agreed by the Parties.

22.   **Miscellaneous.**

22.1   <u>Assignment.</u> Neither this Agreement, nor any rights under this Agreement, may be assigned or delegated by Registered Partner without the express prior written consent of Cisco. Any attempted assignment in violation of the preceding sentence shall immediately terminate the Agreement and be without legal effect. Cisco shall have the right to assign all or part of this Agreement to another Cisco or Cisco-affiliated entity without Registered Partner's approval.

22.2   <u>Relationship of the Parties; No Partnership.</u> Each Party to this Agreement is an independent contractor. This Agreement does not create any agency, partnership, joint venture, employment or franchise relationship. Furthermore, no labor relationship between Cisco and Registered Partner employees is created hereby. Registered Partner shall indemnify and hold Cisco harmless of any claim or judicial action whatsoever from any Registered Partner employee. Neither Party has the right or authority to, and shall not, assume or create any obligation of any nature whatsoever on behalf of the other party or bind the other party in any respect whatsoever. Notwithstanding the use of the term "Partner" in this Agreement, the Parties do not intend to create any legal relationship of partnership between them, and neither

will assert to any third party or otherwise claim that such a legal relationship exists between them.

22.3 <u>Survival.</u> Part A and Sections B.3, B.4, B.6.2, B.6.3, B.8, B.9.3 and B.10 through B.22 shall survive the expiration or termination of this Agreement.

22.4 <u>Notices.</u> All notices required to be provided under this Agreement shall be provided (a) by Registered Partner, to contract-notice@cisco.com, and (b) by Cisco, to the electronic mail address provided by Registered Partner with its Partner Registration application. Notices shall be deemed received one business day after being sent by e-mail.

22.5 <u>Enforceability.</u>

22.5.1 Registered Partner agrees that the electronic mail address it has provided corresponds to a person that has the capacity and authority to execute this Agreement and any amendments on behalf of Registered Partner.

22.5.2 Registered Partner and Cisco each waive any defense to the validity or enforceability of this Agreement arising from the electronic submission and electronic acceptance of this Agreement by Registered Partner.

22.5.3 If Registered Partner needs a physical document evidencing the Agreement, Registered Partner may (i) print the accepted Agreement or (ii) request from Cisco a signed version, in which case Registered Partner shall print and return to Cisco two (2) printed, executed originals of the Agreement. Such printed originals shall not be deemed accepted by Cisco unless Cisco returns one (1) counter-signed original to Registered Partner.

22.5.4 Registered Partner agrees that any contact associated with its online profile with Cisco, as identified by electronic mail address and CCO ID, corresponds to a current employee or person working under a valid contract on behalf of Registered Partner to perform specific ongoing job functions which require access to Cisco Channel resources.

22.5.5 Registered Partner will maintain a current list of approved contact associations. Furthermore, Registered Partner will disassociate employees and contractors from its online profile as soon as their employment is abandoned or terminated.

22.5.6 Registered Partner's employees and contractors will not share CCO IDs, which enables Cisco.com users to view and access personalized information online. If employees do share CCO IDs, Registered Partner will not be in compliance with Cisco's privacy policy statement and EU regulations, which stipulate that Cisco will not share personal information with another individual without express approval.

22.6 <u>Audit.</u> Registered Partner will keep full, true, and accurate records and accounts ("**Records**"), including but not limited to details of the purchase order issued by Registered Partner, the purchase order received by Registered Partner from the End User, documentary proof of delivery to the End User, including signatures and stamps, End User sales invoices, relevant serial numbers, proof of payment, supply contracts, any applicable Cisco special pricing codes (such as Deal IDs), and documentation related to the Records, in accordance with generally-accepted accounting principles, of each Cisco Service and Product purchased and resold, including information regarding compliance with Cisco marketing and sales programs, Software usage and transfer, and export. Records may be kept in electronic or hardcopy form. Registered Partner shall keep such Records for no less than three (3) years after the termination of this Agreement. Registered Partner shall make these Records available for audit by Cisco upon fifteen (15) days prior written notice, during regular business hours, at those locations where Partner may maintain relevant records. Additionally, Registered Partner shall make such Records available via email if requested by Cisco. Registered Partner additionally acknowledges that from time to time Cisco or its independent auditors may request data extracts from the electronic Records (including supervised access to the functioning data processing system from which the data was extracted in order to review records related to Cisco Products and Services to verify payment, suppliers, and related details) and may conduct additional specific audits with the purpose of monitoring and

ensuring compliance by Registered Partner and its Authorized Source with Cisco's policies and applicable laws. Such audits may include, without limitation, investigations in order to prevent the acquisition, use, promotion or Resale of Non-Genuine Products and/or Unauthorized Cisco Products. Audits may include the requirement for access to any Cisco Products stored or used onsite, and verification of the proper use, tracking, and location of any Not For Resale Products. When requested, Registered Partner shall collaborate with Cisco's auditors and provide accurate and truthful information. In all cases, Registered Partner agrees to bear, and/or promptly repay to Cisco, all costs, fees, and expenses, incurred by Cisco in the performance of any such audit and/or investigation that discloses any material breach of this Agreement by Registered Partner. Registered Partner acknowledges and accepts that, in addition to the above audit rights, Cisco may directly contact any End User at any time in order to verify and/or inform End Users about Registered Partner's compliance or non-compliance with this Agreement. Registered Partner acknowledges and accepts that Cisco shall be entitled to recover its costs incurred as a result of Registered Partner's failure to maintain, and provide access to, the Records in compliance with the provisions of this Audit section, and Cisco shall be entitled to recover any revenue lost due to misuse by Registered Partner of any program or promotion, and, if Registered Partner does not reimburse Cisco within 60 days for all amounts improperly claimed, paid, or due, Cisco may, in addition to any other remedy, withhold Registered Partner's access to programs, promotions, and special pricing or discounts.

22.7 <u>Data Protection</u>. Partner agrees to the following in regard to data protection:

22.7.1 Partner will use any data related to sales leads solely for the purpose of contacting the prospective End Users identified (the "Lead") in connection with the promotion and resale of Cisco Products and Services, and for no other purpose.

22.7.2 Partner will not disclose or transfer any Lead data to any other party, without the prior permission of Cisco or the applicable End User (except as otherwise required by applicable law, in which case Partner must first notify Cisco and the End User, if allowable by law).

22.7.3 Lead data is Confidential Information of Cisco and the prospective End User. Partner agrees to protect Lead data with safeguards reasonably designed to protect the information against unauthorized access, use, and disclosure. These safeguards are in addition to any other confidentiality and security obligations contained in agreements between Partner and Cisco.

22.7.4 Partner will use Lead data in compliance with applicable laws and regulations, including, without limitation, those governing unsolicited marketing communications.

22.7.5 Partner will indemnify and hold Cisco harmless from and against any damage, injury, loss, claim, or liability incurred as a result of Partner's failure to abide by this Section 22.7.

22.8 <u>URLs</u>. Registered Partner hereby confirms that it has the ability to access, has accessed, has read and agrees to, the information made available by Cisco at all of the world wide web sites/URLs/addresses/pages referred to anywhere throughout this Agreement. Registered Partner acknowledges that Cisco may modify any URL address or terminate the availability of any information at any address without notice to Registered Partner.

22.9 <u>Other Remedies</u>. All Cisco remedies specified in this Agreement shall be in addition to, and shall in no way limit, any other rights and remedies that might be available to Cisco, all of which Cisco hereby expressly reserves.

22.10 <u>Translations</u>. This Indirect Channel Partner Agreement is prepared in the English language. Other languages are translations for convenience purpose only. If there is any conflict between the original English language and other languages, to the extent permitted by law, the English language shall prevail.

22.11 <u>Communications</u>.   By entering into this Agreement, Registered Partner agrees to receive communications and emails from Cisco and Cisco Authorized Distributors regarding onboarding, certifications, programs, incentive accounts, conduct, and requirements.

22.12 <u>Marketing</u>.  By entering into this Agreement, Registered Partner agrees to allow Cisco to share aggregated information collected from Registered Partner's sales (such as results from statistical models as to propensity to buy and customer wallet share) with other Cisco Channel Partners to market to End Users.

22.13 <u>Severability</u>.   In the event that any of the terms of this Agreement become or are declared to be illegal or otherwise unenforceable by any regulatory body or court of competent jurisdiction, such term(s) shall be null and void and shall be deemed deleted from this Agreement. All remaining terms of this Agreement shall remain in full force and effect. Notwithstanding the foregoing, if this paragraph becomes applicable and, as a result, the value of this Agreement is materially impaired for either Party, as determined by such Party in its sole discretion, then the affected Party may terminate this Agreement by written notice to the other.

*-End-*

Company: _____

By: _____

Name: _____

Title: _____

Date: _____

**Attachment A to the Indirect Channel Partner Agreement**

**Cisco Services Partner Program**

The Cisco Services Partner Program ("CSPP") is an attachment ("Attachment") that supplements the Agreement and all the terms and conditions of the Agreement apply to this Attachment, provided that, to the extent that there is a conflict between the Agreement and this Attachment, the terms of this Attachment shall take precedence over the terms and conditions of the Agreement with regard to the subject matter described herein.

**1   DEFINITIONS.**

1.1   **Additional Program Documentation** means the Cisco Services Partner Program Operations Guide, Build Your Services Portfolio and Cisco Services Partner Program Eligible Bookings Guide incorporated by reference within the Program Guide.

1.2   **Cisco Branded Services** means those service offerings identified as Technical Services and Advanced Services made available for purchase and resale by Reseller under the Program, which can be found at www.cisco.com/go/cspp.

1.3   **Collaborative Services** means those service offerings identified as Collaborative Technical Support and Collaborative Professional Services made available for purchase by Reseller under the Program, which can be found at http://www.cisco.com/go/cspp.

1.4   **Deliverable(s)** means, with respect to each Service Description or SOW, the Reports to be delivered by Cisco to Reseller as specified in the Service Description or SOW, if any.

1.5   **End User Network Information** means the information about End User's network that is collected, stored, and analyzed in connection with the Data Collector Tool, and may include, without limitation, the following information: configurations (including running configurations and startup configurations), product identification numbers, serial numbers, host names, equipment locations, IP addresses, system contacts, equipment models, feature sets, software versions, hardware versions, installed memory, installed flash, boot versions, chassis series, exceptions to such information (e.g., duplicate host name, duplicate IP address, device running interim release image), slot IDs, card types, card families, firmware versions, and other network and inventory information as deemed appropriate by Cisco.

1.6   **Excluded Service Programs** means those services not available under the Program but made available under Cisco's Solution Technology Integrator program, Cisco's Partner Essential Operate Support program, and Cisco's Smart Care Service program, and any other services that Cisco elects to exclude from this Program, subject to providing sufficient Notice.

1.7   **Intellectual Property** means any and all tangible and intangible: (i) rights associated with works of authorship throughout the world, including but not limited to copyrights, neighboring rights, moral rights, and mask works, and all derivative works thereof, (ii) trademark and trade name rights and similar rights, (iii) trade secret rights, (iv) patents, designs, algorithms and other industrial property rights, (v) all other intellectual and industrial property rights (of every kind and nature throughout the world and however designated) whether arising by operation of law, contract, license, or otherwise, and (vi) all registrations, initial applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force (including any rights in any of the foregoing).

1.8   **Other Product** means Product an End User acquired from sources other than Reseller.

1.9   **Previous Service Program** means the support program(s) including, but not limited to, Cisco Brand Resale ("CBR"), Cisco Shared Support Program ("CSSP"), and Cisco's Partner-Core Bridge Service program, and Co-Brand Foundation Program, under which Reseller was or may have been previously participating and receiving services from Cisco prior to the Program becoming available.

1.10   **Program** means the Cisco Services Partner Program.

1.11  **Program Guide** means the governing document for Cisco Services Partner Program, defining program elements, including, but not limited to, eligibility, performance management, and any applicable rebates. The Program Guide (including the Additional Program Documentation incorporated therein) applicable for transactions through Cisco China Company, Limited and Cisco (China) Innovation Technology Co., Ltd. is the country-specific Program Guide for the People's Republic of China made available by Cisco on http://www.cisco.com/go/cspp.

1.12  **Program Start Date** means the date when Reseller is authorized to participate in the Program and shall be the i) Effective Date of this Agreement for Territory in which Cisco has made the Program available or ii) the date provided in a notice by Cisco on the Program website and/or via email that the Program is being made available in an applicable Territory.

1.13  **Report(s)** means a report or reports generated by Cisco based on End User Network Information. The information contained in Reports may include part or all of the collected End User Network Information, product alert information, and such other information as Cisco deems appropriate.

1.14  **Statement of Work or SOW** means the documents agreed upon by the parties that define the services and deliverables, if any, to be provided there under.

1.15  **TAC** means Cisco's Technical Assistance Center.

1.16  **Territory** means the country or countries in which Cisco has made the Program available to Reseller.

1.17  **Tool(s)** means the software or hardware appliance, commonly referred to as "Data Collector Tools" or "Collectors", which enables Reseller to run, on one or more computers connected to an End User's network, data collection devices in order to collect, analyze and provide reports regarding End User Network Information.

2  **SCOPE OF THE PROGRAM.**

2.1  This Attachment sets forth the governing terms and conditions for the Program under which Reseller is authorized to purchase and license Services from Authorized Source as of the Program Start Date. Except for Excluded Service Programs, any other attachment(s), exhibit(s) and/or appendices to the Agreement addressing services supported under a Previous Service Program within a Territory in which Program has been available is hereby deleted in its entirety as of the Program Start Date.

2.2  Reseller is eligible to participate in Previous Service Program in Territory for which CSPP has not yet become generally available. When the Program becomes available in a Territory (and Reseller is notified by Cisco of that availability), Previous Service Program will automatically terminate within such Territory and Reseller will gain entry in to Program in the applicable Territory and be entitled to participate in any service offerings for which eligibility requirements have been met.

3  **ELIGIBILITY.**  Reseller acknowledges that it is authorized to provide Services under this Program for Products only on those technologies where Reseller has achieved such Cisco designated specializations or certifications as specified in the eligibility portion of the Program Guide and/or Additional Program Documentation. Additionally, Reseller understands and acknowledges that Cisco may from time to time require Cisco's Advanced Technology Provider certification or other specializations as a pre-requisite to the Reseller being certificated as meeting the requirements to support certain technologies or Products.

4  **CHANGE OF SCOPE.**  Cisco reserves the right to make changes to the Program, or parts thereof, at any time, including, but not limited to, the eligibility criteria, performance metrics, service offerings, and rebates. Any Program changes shall become effective ninety (90) days from the date of Notice provided by Cisco.

5  **CISCO RIGHTS AND OBLIGATIONS.**

5.1  Cisco will make available the Services listed at http://www.cisco.com/go/cspp for purchase and resale, as applicable, by Reseller under the Program. Services are subject to availability

limitations specified in the applicable Service Description. For any Services provided by Cisco directly to End User, Cisco shall perform the Services on behalf of Reseller, acting as Reseller's subcontractor.

5.2 <u>Inspection Fee.</u> In order to be eligible to receive support services as set out herein for Product that has not been previously supported, for Product where support has lapsed and/or for Other Product, the following shall apply:

5.2.1 Cisco may charge an inspection fee for Product and/or Other Product in accordance with Cisco's standard fee schedule on the Price List in effect at the time of inspection (any related upgrades, replacements, repairs, or troubleshooting are excluded); and

5.2.2 Cisco will validate a Software license exists for Software to be supported. Where a valid Software license does not exist, a Software license fee shall be payable by Reseller to Cisco.

5.3 <u>Support under Previous Support Program.</u> Product for which support was paid under Previous Support Program shall continue to be supported at the same level previously purchased until expiration of the support term after which time any further support shall be subject to the terms of the Program.

# 6   RESELLER RIGHTS AND OBLIGATIONS.

6.1 Reseller has read, understood, and agrees to comply with Program Guide, and Additional Program Documentation contained therein, located at http://www.cisco.com/go/cspp, which is incorporated herein by reference and may be updated from time to time by Cisco in its sole discretion under Section 4.0 (Change of Scope). Reseller must comply at all times with requirements of particular Services, Program Guide, and Additional Program Documentation in order to achieve and retain the benefits of the Program, including any associated rebates.

6.2 Prior to accepting a purchase order from an End User for Services provided by Cisco directly to End User, Reseller shall refer the End User to http://www.cisco.com/go/servicedescriptions, where the relevant Service Description and End User Obligations are posted, or provide a current copy of such documents to End User and ensure that End User understands (i) Cisco's obligations, (ii) End User's responsibilities under the applicable Service Description, and (iii) End User Obligations.

6.3 For transactions through Cisco China Company, Limited and Cisco (China) Innovation Technology Co., Ltd., Reseller acknowledges and agrees that no rebates are available and any additional or different compensation for such transactions is set forth in the Program Guide for the People's Republic of China.

# 7   REPRESENTATION OF CISCO BRAND.   Reseller agrees to comply with the guidelines located at http://www.cisco.com/web/partners/market/partner-marks.html, which is incorporated herein by reference.

# 8   RESERVED.

# 9   LICENSE.   Subject to the terms and conditions herein, Cisco grants to Reseller a limited, revocable, non-exclusive, non-transferable license to (a) use, display, reproduce, modify, and distribute Deliverables; (b) create, use, reproduce, and distribute derivative works of the Deliverables; and c) distribute Software that Reseller may receive as a result of Services provided under the Program, only on Product covered under the Program. The license herein is granted solely for Reseller's support of End Users during its participation in the Program and solely for use with Cisco products. Reseller may not sublicense to any persons or entity any rights to reproduce or distribute the Deliverables. Cisco also may terminate this license upon written or oral notice to Reseller, with or without prior notice.

Access to and use of Tool(s) by Reseller is subject to acceptance of the Cisco End User License Agreement located at www.cisco.com/go/warranty, incorporated by reference and made a part hereof. Reseller agrees to return Tool(s) upon termination of the license or upon Cisco's request that the Tool(s) be returned to Cisco.

10 **OWNERSHIP.** As between Reseller and Cisco, Cisco shall at all times retain all right, title, and interest in and to all pre-existing Intellectual Property owned by Cisco as of the Effective Date and all Intellectual Property in and to the Services and Deliverables or other Intellectual Property provided or developed by Cisco or a third party on Cisco's behalf thereafter. As between Reseller and Cisco, Reseller shall at all times retain all right, title, and interest in and to all pre-existing Intellectual Property owned by Reseller as of the Effective Date and all Intellectual Property that is developed by Reseller or by a third party on Reseller's behalf thereafter without the benefit of any of Cisco's Intellectual Property. Third party hardware and software shall at all times be owned by the applicable third party.

11 **WARRANTY.** ALL SERVICES PROVIDED HEREUNDER SHALL BE PERFORMED IN A WORKMANLIKE MANNER. EXCEPT AS SPECIFIED IN THIS SECTION, CISCO HEREBY DISCLAIMS AND RESELLER WAIVES ALL REPRESENTATIONS, CONDITIONS, AND WARRANTIES (WHETHER EXPRESS, IMPLIED, OR STATUTORY), INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OR CONDITION (A) OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, TITLE, SATISFACTORY QUALITY, QUIET ENJOYMENT, ACCURACY, (B) ARISING FROM ANY COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE IN THE INDUSTRY. TO THE EXTENT AN IMPLIED WARRANTY CANNOT BE DISCLAIMED, SUCH WARRANTY IS LIMITED IN DURATION TO THE APPLICABLE EXPRESS WARRANTY PERIOD. RESELLER'S SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY SHALL BE, AT CISCO'S OPTION, RE-PERFORMANCE OF THE SERVICES; OR CANCELLATION OF THE APPLICABLE SERVICE ORDERED AND RETURN OF THE PORTION OF THE SERVICE FEES PAID TO CISCO BY AUTHORIZED SOURCE FOR SUCH NON-CONFORMING SERVICES.

12 **LIMITATION OF LIABILITY AND CONSEQUENTIAL DAMAGES WAIVER.**

12.1 ALL LIABILITY OF CISCO, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND SUPPLIERS (COLLECTIVELY) FOR CLAIMS ARISING UNDER THIS ATTACHMENT OR OTHERWISE HOWSOEVER ARISING SHALL BE LIMITED TO THE AMOUNT PAID BY AUTHORIZED SOURCE TO CISCO PURSUANT TO THE RELEVANT SERVICE DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENT OR CIRCUMSTANCES FIRST GIVING RISE TO SUCH LIABILITY. THIS LIMITATION OF LIABILITY IS CUMULATIVE AND NOT PER-INCIDENT (I.E., THE EXISTENCE OF TWO OR MORE CLAIMS WILL NOT ENLARGE THIS LIMIT).

12.2 EXCEPT FOR RESELLER'S BREACH OF SECTION 9 (LICENSE), IN NO EVENT SHALL EITHER PARTY, ITS RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SUPPLIERS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, OR LOST REVENUE, LOST PROFITS, OR LOST OR DAMAGED DATA, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF.

12.3 RESELLER EXPRESSLY ACKNOWLEDGES AND AGREES THAT IT IS SOLELY RESPONSIBLE FOR THE DETERMINATION AND IMPLEMENTATION OF THEIR END USER'S NETWORK, DESIGN, BUSINESS, OR OTHER REQUIREMENTS AND THAT CISCO SHALL NOT BE RESPONSIBLE FOR THE FAILURE OF DELIVERABLES AND/OR RELATED SOFTWARE TO MEET END USER'S NETWORK, DESIGN, BUSINESS, OR OTHER REQUIREMENTS.

12.4 If this Agreement is governed by the laws of England, the following will apply.

12.4.1 Nothing in this Agreement shall limit (i) the liability of Cisco, its Affiliates, officers, directors, employees, agents and suppliers to Reseller for personal injury or death caused by their negligence, (ii) Cisco's liability for fraudulent misrepresentation, or (iii) Cisco's liability in connection with any terms which cannot be excluded under applicable law.

13 **DATA USAGE AND PROTECTION.**

13.1 For the purposes of this Section, "personal data", "processing of personal data", ("processing"),"controller", "processor", "data subjects", and "third party", shall have the same meanings as in Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and of the free movement of such data. If the applicable laws implementing the Directive in a particular country apply a broader definition of "personal data" (e.g. so as also to include information about legal entities), then the definition of "personal data" under that country's implementing laws shall apply.

13.2 Cisco shall, during the term of this Agreement, comply with all applicable laws, regulations, regulatory requirements, and codes of practice in connection with any processing of personal data which they undertake in the performance of or in connection with this Agreement or which may otherwise apply, including, without limitation, privacy or data protection laws applicable in the country or countries where personal data is collected or held or otherwise processed including, but not limited to laws and regulations implementing Directive 95/46/EC (such as the UK Data Protection Act 1998), Directive 2002/58/EC on Privacy and Electronic Communications, and any data privacy laws enacted thereunder (together, the "Data Protection Laws").

13.3 Cisco shall not transfer End User personal data across any country border unless it is strictly unavoidable for the proper performance of the Services.

13.4 Cisco shall treat all personal data in a manner consistent with its Privacy Policy statement (available at Cisco.com).

## 14   ASSIGNMENT AND SUBCONTRACTING.

14.1 Without prejudice to the Assignment provision of the Agreement, Reseller may not delegate, assign, or subcontract any obligation which it has to an End User to provide support services for Products under the Program incorporating any of the Services, except where;

(i) otherwise permitted in writing by Cisco or with its prior written consent; or

(ii) Reseller subcontracts to a company that meets the qualification criteria for participation under the Program but is acting as a subcontractor to Reseller ("Services Only Partner"); or

(iii) Reseller subcontracts to a service provider in respect of which Reseller demonstrates to Cisco's reasonable satisfaction, such approval not to be unreasonably withheld or delayed, that the service provider provides support services of an equivalent level of quality to a Reseller qualified under the Program.

14.2 In the event that the Territory includes a country within the European Economic Area ("EEA"), Reseller is authorized to provide support services incorporating the Services under the Program in an EEA country ("Destination Country") where it is not qualified to participate in the Program, provided it has either: (i) subcontracted the Services to a Services Only Partner qualified in the Destination Country as set forth above; or (ii) made other arrangements to Cisco's reasonable satisfaction, such approval not to be unreasonably withheld or delayed, to provide support services in the Destination Country of a quality equivalent to a Services Only Partner qualified in that country.

14.3 In all permitted exceptions identified above, the Reseller subcontracting the Services shall remain entirely responsible and any actions taken by the Reseller or the Services Only Partner will count in the measurement of Reseller's performance metrics under the Program.

## 15   TERM AND TERMINATION.

15.1 In addition to all rights and remedies which it may have under the Agreement, Cisco may terminate or suspend its performance in respect of some or all Products covered under this Program, whether or not Products were purchased prior to or subsequent to the Effective Date, immediately upon Notice if (i) Cisco receives notice from its Authorized Distributor of

Reseller's failure to pay for the Services when due and fails to make such payment within fifteen (15) days after Cisco's receipt of such notice from its Authorized Distributor; (ii) if Reseller breaches the provisions of Section 9 (License), sub-Section 17.2 (Disclosure of Contract Information), sub-Section 17.3 (Service Marks), and/or any of the material provisions of this Attachment and fails to remedy such breach within thirty (30) days after written notification by Cisco to Reseller of such breach; (iii) in the event that Cisco discontinues Service for one or more Product for whatever reason, or (v) the Agreement terminates.

15.2   Cisco may at any time terminate the Program for convenience, for any reason or no reason, by providing Reseller with ninety (90) days prior written notice of termination.

15.3   This Attachment shall terminate when the Agreement terminates.

15.4   In the event that Cisco's obligations to Reseller under this Program with respect to support of Product for which payment was made prior to the expiration of the term as set forth in this Section extend beyond the term as applicable, and provided that Reseller complies with the terms of the Agreement and its obligations in this Attachment, Cisco will provide support to Reseller for the term of support specified in the purchase order issue to Cisco by Authorized Source provided that the maximum period of support shall not exceed three (3) years from the date of such purchase order.

16   **INDEMNIFICATION**.  Reseller hereby indemnifies and holds Cisco harmless from any claim, loss, damage, or expense, including, but not limited to, reasonable court costs and attorneys' fees, resulting from any claim made by End User against Cisco that: (a) Reseller has failed to provide End User with support services in accordance with an agreement between Reseller and End User; or (b) Reseller has failed to comply with or perform its obligations set forth in this Agreement, whether under a claim of a third party beneficiary or otherwise. This shall not limit Cisco's obligations, subject to the terms of this Agreement, to provide the support services described herein.

17   **GENERAL.**

17.1   Third Party Services.  Cisco reserves the right to subcontract the provision of all or part of the Services to a third party.

17.2   Disclosure of Contract Information.  Reseller acknowledges and agrees that in no event shall any of the information contained in this Agreement or Reseller's service contract number(s) or Cisco.com access information be disclosed to any third party.  Such information shall be considered Confidential Information under the Agreement.

17.3   Service Marks.  Reseller will not use Cisco's service marks in any manner except as set out in this Agreement or as mutually agreed upon in writing.

17.4   Entitlement.   Reseller acknowledges that Cisco has the right to verify an End User's entitlement to receipt of Services, and that End User is entitled to receive support services only on Product for which Reseller has paid the applicable license and support fees to Cisco. Reseller agrees to assist Cisco with enforcement of End User entitlement as necessary, including, without limitation, providing serial number(s) to Cisco and enabling Cisco to undertake inventory review(s).

17.5   Notices.  All notices required or permitted under this Attachment will be in writing and will be deemed given one (1) day after deposit with a commercial express courier specifying next day delivery (or two (2) days for international courier packages specifying 2-day delivery), with written verification of receipt.  All communications will be sent to the addresses set forth on the cover sheet of this Agreement or such other address as may be designated by a party by giving written notice to the other party pursuant to this paragraph.  Notwithstanding the above, notices regarding changes to the Program may also be by posting on Cisco.com or by e-mail or fax.

17.6   Survival.  Sections 9 (License), 10 (Ownership), 11 (Warranty), 12 (Limitation of Liability and Consequential Damages Waiver), 13 (Data Usage and Protection), 15 (Term and

Termination),  16 (Indemnification),  and 17 (General) shall survive the termination  or expiration of this Attachment.