John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Douglas J. Dixon, State Bar No. 275389
ddixon@hueston.com
Craig A. Fligor, State Bar No. 323174
cfligor@hueston.com
HUESTON HENNIGAN LLP
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone:    (949) 229-8640
Facsimile:    (888) 775-0898

Attorneys for Defendants and Counterclaimants
BECCELA'S ETC., LLC and
ARBITECH, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC., et al., | Case No. 5:18-CV-00477-BLF |
| Plaintiffs, | **OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE DEFENDANTS' AMENDED COUNTERCLAIMS AND REQUEST FOR RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| vs. | |
| BECCELA'S ETC., LLC, et al., | |
| Defendants and Counterclaimants. | Date:          July 18, 2019 |
| | Time:          9:00 a.m. |
| | Courtroom:  3, 5th Floor |
| | Judge:         Hon. Beth Labson Freeman |

## TABLE OF CONTENTS

Page

I.   INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED ........................ 1

II.  STATEMENT OF FACTS ................................................................................ 3

    A.   Cisco's Misrepresentations Regarding Secondary Market Goods ..................... 3

    B.   Cisco's Restrictive Licensing ................................................................ 4

    C.   Cisco's SMARTnet Abuse ..................................................................... 5

    D.   Cisco's Wrongful Denial of Warranty Coverage ....................................... 5

III. PROCEDURAL HISTORY .............................................................................. 6

IV.  LEGAL STANDARD ..................................................................................... 7

V.   ARGUMENT ............................................................................................... 7

    A.   Arbitech and BecTech Have Stated a Claim that the Resale of
        Genuine but Unwarranted Cisco Products Does Not Violate the
        Lanham Act ....................................................................................... 7

        1.   Cisco's Complaint and First Amended Complaint put
            warranty coverage at issue ........................................................ 8

        2.   Noerr-Pennington does not apply ............................................... 10

    B.   Arbitech and BecTech Have Stated a Claim that Cisco's Failure to
        Warrant Secondary Market Goods Violates General Business Law
        section 369-b ..................................................................................... 12

        1.   New York courts would imply a private right of action ..................... 12

        2.   Cisco's warranty expressly disclaims coverage of secondary
            market products ...................................................................... 14

    C.   Arbitech and BecTech Have Stated a Claim that Cisco Violated the
        Unlawful, Unfair, and Fraudulent Prongs of California's Unfair
        Competition Law ................................................................................ 15

        1.   Cisco has engaged in unlawful behavior ...................................... 15

        2.   Cisco has engaged in unfair behavior .......................................... 15

        3.   Cisco has engaged in fraudulent behavior .................................... 19

    D.   Arbitech and BecTech Have Stated a Claim that Cisco Has Engaged
        in False or Misleading Representations of Fact in Violation of the
        Lanham Act ....................................................................................... 20

        1.   Cisco misclassifies secondary market goods ................................. 20

1

TABLE OF CONTENTS (cont.)

2

<u>Page</u>

3        2.    Cisco misrepresents the legal effect of its licensing agreement .................22

4        3.    Arbitech and BecTech sufficiently pleaded materiality and
               proximate causation ......................................................................22

5

6    E.    Arbitech and BecTech Are Entitled to Attorney's Fees .........................................24

VI.    CONCLUSION.............................................................................................................25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

5566805

TABLE OF AUTHORITIES

Page(s)

**<u>Cases</u>**

*Apple, Inc. v. Psystar Corp.*,
   658 F.3d 1150 (9th Cir. 2011) ........................................ 17

*Baggett v. Gates*,
   32 Cal.3d 128 (1982) ........................................ 3, 24, 25

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*,
   223 F.3d 1082 (9th Cir. 2000) ........................................ 11

*Bel Canto Design, Ltd. v. MSS Hifi, Inc.*,
   837 F.Supp.2d 208 (S.D.N.Y. 2011) ........................................ 12

*Blizzard Entertainment Inc. v. Ceiling Fan Software LLC*,
   941 F.Supp.2d 1227 (C.D. Cal. 2013) ........................................ 19

*Bobbleheads.com, LLC v. Wright Bros., Inc.*,
   259 F.Supp.3d 1087 (S.D. Cal. 2017) ........................................ 20

*Cal. Licensed Foresters Assn. v. State Bd. of Forestry*,
   30 Cal.App.4th 562 (Cal. Ct. App. 1994) ........................................ 25

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   973 P.2d 527 (Cal. 1999) ........................................ 15

*Cook, Perkiss, and Liehe, Inc.*,
   911 F.2d 242 (9th Cir. 1990) ........................................ 23

*Drum v. San Fernando Valley Bar Ass'n*,
   182 Cal.App.4th 247 (Cal. Ct. App. 2010) ........................................ 16, 18, 19

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ........................................ 25

*Huf Worldwide, LLC v. Wal-Mart Stores, Inc.*,
   2017 WL 766794 (S.D. Cal. Feb. 28, 2017) ........................................ 8

*Indus. Models, Inc. v. SNF, Inc.*,
   716 Fed.Appx. 949 (Fed. Cir. 2017) ........................................ 11

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
   2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) ........................................ 18

*Kasky v. Nike, Inc.*,
   27 Cal.4th 939 (2002) ........................................ 24

*Kearney v. Foley & Lardner, LLP*,
   590 F.3d 638 (9th Cir. 2009) ........................................ 10

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ........................................ 15, 19

- iii -

TABLE OF AUTHORITIES (cont.)

Page(s)

*Knology, Inc. v. Insight Comms. Co., L.P.*,
   460 F.3d 722 (6th Cir. 2006) ...................................................................... 2, 10

*Knutson v. Sirius XM Radio Inc.*,
   771 F.3d 559 (9th Cir. 2014) .......................................................................... 17

*Kwan Software Engineering, Inc. v. Foray Techs., LLC*,
   2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ................................................. 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ........................................................................................ 23

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
   83 F.Supp.3d 501 (S.D.N.Y. 2015) ................................................................ 21

*Los Angeles Lakers, Inc. v. Fed. Ins. Co.*,
   869 F.3d 795 (9th Cir. 2017) ............................................................................ 7

*McVicar v. Goodman Global, Inc.*,
   1 F. Supp. 3d 1044 (C.D. Cal. 2014) .............................................................. 16

*Mercer Pub., Inc. v. Smart Cookie Ink, LLC*,
   2012 WL 12863934 (W.D. Wash. July 25, 2012) .......................................... 10

*Microsoft Corp. v. A&S Elecs., Inc.*,
   2017 WL 976005 (N.D. Cal. Mar. 14, 2017) ............................................ 17, 19

*Miller Pipeline Corp. v. British Gas PLC*,
   69 F.Supp.2d 1129 (S.D. Ind. 1999) ............................................................... 11

*NEC Elecs. v. CAL Circuit Abco*,
   810 F.2d 1506 (9th Cir. 1987) ........................................................................... 8

*Negrin v. Norwest Mortgage, Inc.*,
   263 A.D.2d 39 (N.Y. App. Div. 1999) ............................................................ 13

*NL Indus., Inc. v. Kaplan*,
   792 F.2d 896 (9th Cir. 1986) ........................................................................... 14

*Norcia v. Samsung Telecomms. Am., LLC*,
   845 F.3d 1279 (9th Cir. 2017) ..................................................................... 2, 16

*Ours Tech., Inc. v. Data Drive Thru, Inc.*,
   645 F.Supp.2d 830 (N.D. Cal. 2009) ................................................................ 9

*People v. Tempur-Pedic Int'l, Inc.*,
   95 A.D.3d 539 (N.Y. App. Div. 2012) ............................................................ 13

*Practice Management Info. Corp. v. Am. Med. Ass'n*,
   121 F.3d 516 (9th Cir. 1997) ....................................................................... 2, 22

<u>TABLE OF AUTHORITIES (cont.)</u>

Page(s)

*Rice v. Fox Broadcasting Co.*,
   330 F.3d 1170 (9th Cir. 2003) ........................................................................ 23

*SanDisk Corp. v. STMicroelectronics, Inc.*,
   480 F.3d 1372 (Fed. Cir. 2007) ........................................................................ 9

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,
   53 F.3d 1073 (9th Cir. 1995) ...................................................................... 1, 8

*Semegen v. Weidner*,
   780 F.2d 727 (9th Cir. 1985) ........................................................................ 20

*Sheehy v. Big Flats Community Day, Inc.*,
   73 N.Y.2d 629 (1989) ............................................................................... 2, 12

*Shell Gulf of Mexico, Inc. v. Ctr. for Biological Diversity, Inc.*,
   2012 WL 12865419 (D. Alaska June 26, 2012) ...................................... 10, 11

*SoftMan Prods. Co., LLC v. Adobe Systems, Inc.*,
   171 F.Supp.2d 1075 (C.D. Cal. 2001) ............................................................ 17

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ........................................................................ 10

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ...................................................................... 20

*Theme Promotions, Inc. v. News Am. Marketing FSI*,
   546 F.3d 991 (9th Cir. 2008) ........................................................................ 10

*Time Warner Cable, Inc. v. DirecTV, Inc.*,
   497 F.3d 144 (2d Cir. 2007) ...................................................... 20, 21, 22, 23

*Toshiba Am. Info. Sys. v. Advantage Telecom, Inc.*,
   19 Fed.Appx. 646 (9th Cir. 2001) .................................................................. 8

*Vernor v. Autodesk, Inc.*,
   621 F.3d 1102 (9th Cir. 2010) ................................................................ 17, 18

*Walker v. Countrywide Home Loans, Inc.*,
   98 Cal.App.4th 1158 (2002) .......................................................................... 24

*Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*,
   447 F.3d 769 (9th Cir. 2006) ........................................................................ 17

*West v. Palo Alto Housing Corp.*,
   2018 WL 1184950 (N.D. Cal. Mar. 7, 2018) .......................................... 14, 15

*Westlands Water Distrib. Dist. v. NRDC, Inc.*,
   276 F.Supp.2d 1046 (E.D. Cal. 2003) ............................................................ 11

- v -

TABLE OF AUTHORITIES (cont.)

Page(s)

*WMH Tool Grp., Inc. v. Woodstock Int'l, Inc.,*
2009 WL 6825247 (N.D. Ill. Dec. 9, 2009)........................................................ 10

*WorldHomeCenter.com, Inc. v. KWC America, Inc.,*
2011 WL 4352390 (S.D.N.Y. Sept. 15, 2011) .................................................... 12

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
433 F.3d 1199 (9th Cir. 2006) ........................................................................... 11

**Statutes**

15 U.S.C. § 1114........................................................................................................ 1, 7

15 U.S.C. § 1125......................................................................................... 1, 2, 7, 15, 20

Cal. Bus. & Prof. Code § 17200 ................................................................................ 2, 15

Practice Commentary, McKinney's Consol. Laws of N.Y., Book 19, at 523–24,
Gen. Bus. Law § 369 ............................................................................................ 13, 24

**Rules**

Fed. R. Civ. P. 8........................................................................................................... 7

Fed. R. Civ. P. 15......................................................................................................... 25

**Other Authorities**

U.S. Copyright Office, *Software-Enabled Consumer Products* (December 2016)........................ 18

5566805

1    **I.      INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED**

2          Plaintiffs and Counterdefendants Cisco Systems, Inc. and Cisco Technology, Inc. (together,

3    "Cisco"), like many large manufacturers, have long chafed at a fundamental rule of trademark law

4    in the United States: that "the right of a producer to control distribution of its trademarked product

5    does not extend beyond the first sale of the product." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,

6    53 F.3d 1073, 1074 (9th Cir. 1995). Cisco's business practices are designed to circumvent this "first

7    sale doctrine" at every turn. Cisco endeavors to control the downstream sales of its products by

8    funneling its products through "Partners" in what it calls its "Authorized Channel Network." Cisco

9    harasses lawful resellers of genuine Cisco products who are not its "Partners" and instead sell Cisco

10   products in the "secondary market." Cisco also attempts to deter consumers from purchasing

11   authentic Cisco products outside the Authorized Channel, including by withholding warranty support

12   and by misleading consumers about the authenticity and provenance of secondary market products.

13   Moreover, after consumers have purchased Cisco hardware on the secondary market, Cisco demands

14   that those consumers pay it "relicensing fees" before they even turn their lawfully purchased products

15   on, telling consumers that they do not have a license to the products' embedded software (without

16   which the product will not function). These practices violate state and federal law to the detriment of

17   both independent resellers and consumers.

18         Defendants and Counterclaimants Arbitech, LLC ("Arbitech") and Beccela's Etc., LLC

19   ("BecTech") assert counterclaims to force Cisco to cease its unlawful, unfair, and fraudulent business

20   practices that deter consumers from purchasing Cisco products from Arbitech and BecTech. When

21   Cisco brings its business model into compliance with the law, the increased competition for Cisco

22   products on the secondary market also will result in lower prices for consumers. As explained in

23   greater detail below, the Court should deny Cisco's Motion to Dismiss and/or Strike ("Motion") in

24   its entirety.

25         *First*, Arbitech and BecTech have adequately pleaded that a sale of genuine Cisco products

26   – which Cisco has unilaterally deemed ineligible for warranty services – does not violate the Lanham

27   Act, 15 U.S.C. §§ 1114, 1125. Cisco put warranty services at issue in this matter by alleging that its

28   refusal to warrant products on the secondary market constitutes a "material difference" to support its

trademark infringement claim. *See* First Amended Complaint ("FAC"), Dkt. 51 at ¶ 24. Moreover, Cisco cannot use the *Noerr-Pennington* doctrine as a shield against a declaratory judgment action. *See Knology, Inc. v. Insight Comms. Co., L.P.*, 460 F.3d 722, 726 (6th Cir. 2006).

*Second*, Arbitech and BecTech have adequately pleaded that Cisco's refusal to warrant genuine Cisco products acquired outside the "Authorized Reseller Network" violates New York General Business Law section 369-b and is unenforceable in New York. The plain text of Cisco's warranty policy disclaims warranty coverage for products sold on the secondary market and therefore runs afoul of section 369-b. New York courts would imply a private right of action in light of section 369-b's purpose and text. *Sheehy v. Big Flats Community Day, Inc.*, 73 N.Y. 2d 629, 633 (1989).

*Third*, Arbitech and BecTech have adequately pleaded that Cisco has engaged in unlawful, unfair, or fraudulent business acts or practices in violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* Cisco has engaged in unlawful behavior by violating section 369-b and the false advertising provisions of the Lanham Act, 15 U.S.C. § 1125(a). Arbitech and BecTech also allege that Cisco has engaged in unfair behavior, including related to its warranty policy, licensing agreement, and software updates. Further, Cisco has engaged in fraudulent behavior through false advertising and blatant misrepresentations to consumers regarding the secondary market.

*Fourth*, Arbitech and BecTech have adequately pleaded that Cisco has engaged in false or misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a). Cisco routinely misclassifies genuine, lawfully obtained Cisco products as "used," "stolen," "counterfeit," or "scrapped" so as to dupe consumers into buying products from it or its Partners. Cisco also misrepresents the legal effect of its licensing agreement – an agreement that is not validly enforceable in light of California contract provisions and the first sale doctrine. *See Norcia v. Samsung Telecomms. Am., LLC,* 845 F.3d 1279, 1287 (9th Cir. 2017); *Practice Management Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520–21 (9th Cir. 1997).

*Fifth*, Arbitech and BecTech adequately pleaded their entitlement to attorney's fees for vindicating public rights on behalf of consumers and other independent resellers. This litigation vindicates an important public right, confers a benefit on consumers and other secondary market

1    retailers, and imposes a financial burden on Arbitech and BecTech out of proportion with their

2    individual stake in the matter. *Baggett v. Gates*, 32 Cal. 3d 128, 142 (1982).

3    **II.    STATEMENT OF FACTS**

4           Cisco sells its products through the authorized channel to "Authorized Channel Partners" or

5    "Authorized Resellers." Amended Answer and Counterclaims ("AAC"), Dkt. 81 at ¶ 157. Despite

6    Cisco's efforts to control the resale of Cisco products, a robust "secondary market" exists, in which

7    independent resellers offer lawfully obtained, genuine Cisco goods to consumers at more competitive

8    prices than Cisco and Cisco's authorized Partners. *Id.* ¶¶ 158, 167. The secondary market operates

9    as an economically efficient mechanism for Cisco Partners and consumers to offload Cisco products

10   they will not use. *Id.* ¶¶ 159–60.

11          Cisco characterizes Arbitech and BecTech as lawless, fly-by-night companies, who acquire

12   and resell Cisco-branded products without regard for their authenticity. *See generally* FAC. This

13   could not be further from the truth. Arbitech and BecTech sell genuine, legally acquired Cisco

14   products on the secondary market. AAC ¶ 147. Because Arbitech's and BecTech's reputations

15   depend on selling genuine products, they have taken aggressive steps to detect and eschew the sale

16   of counterfeit goods, including developing quality control procedures, notifying Cisco about

17   suspected counterfeit goods, and verifying that sellers of goods are authorized as Cisco Partners.

18   *Id.* ¶¶ 191–95.

19          Cisco deploys unlawful and unfair consumer-facing strategies that deter consumers from

20   purchasing secondary market goods. For example, Cisco falsely disparages new products on the

21   secondary market as "used," requires purchasers to pay a licensing fee to use the products and refuses

22   to provide critical updates to secondary market goods. *Id.* at ¶¶ 175–77, 186. Cisco's conduct violates

23   state and federal law.

24          **A.     Cisco's Misrepresentations Regarding Secondary Market Goods**

25          Cisco's publications make its hostility to the secondary market clear. Cisco's website and

26   communications with consumers make numerous false or misleading statements of fact with respect

27   to secondary market Cisco products. Cisco accuses secondary market resellers of "tak[ing] advantage

28   of Cisco's name, often at [consumers'] expense" and urges consumers to "[r]eport observed instances

1   of gray marketing" to Cisco and to "[l]earn to detect early warning signs of unauthorized-channel

2   product sales," lest they fall victim to the "perils of unauthorized activities." *Id.* ¶ 162. Internally,

3   Cisco trains its employees to disparage secondary market products to its customers, emphasizing the

4   "huge business and financial risks" that the purchase of such products entails. *Id.* ¶¶ 162–66.

5        Cisco habitually describes secondary market products as "used," "stolen," "counterfeit" or

6   "scrapped," simply because these products were traded on the secondary market. *Id.* ¶ 185. Cisco

7   adopts unusual – *i.e.*, misleading – definitions of these terms to confuse customers. For example, it

8   defines "used" equipment as "previously owned equipment that is now owned by a party other than

9   the original customer," regardless of whether the product was ever actually *used*, or even *opened*, by

10  the initial purchaser. *Id.* ¶¶ 186–87. As a result, end users or resellers who communicate with Cisco

11  about the status of certain Cisco products are deliberately provided with misinformation.

12       **B.    Cisco's Restrictive Licensing**

13       Cisco products, like virtually all modern electronics, contain embedded software. And just as

14  a car, refrigerator, or cell phone will not function properly without its internal software, Cisco's

15  products cannot function without Cisco's embedded software. Turning the products on, and operating

16  them even in basic ways, makes use of the software. Without the software, Cisco hardware is

17  essentially scrap metal. *Id.* ¶ 169.

18       Although Cisco concedes that consumers can freely buy its hardware on the secondary

19  market, Cisco's End User Licensing Agreement ("EULA") attempts to prevent those same

20  consumers from making use of the hardware they have lawfully purchased. Cisco informs consumers

21  *after their purchases* that although they have managed to *buy* the hardware, Cisco will only *license*

22  them the software that is embedded on the hardware. *Id.* ¶ 170. Cisco does not require end users to

23  acknowledge, read, or accept a license agreement before purchasing or using the Cisco products. *Id.*

24  Nevertheless, the EULA purports to license the software only to consumers who purchase Cisco

25  hardware from an "Approved Source," defined as "Cisco or . . . [a] Cisco authorized reseller,

26  distributor, or systems integrator[.]" *Id.* ¶¶ 170–71. To operate a new, genuine Cisco product

27  purchased on the secondary market, Cisco requires consumers to pay a licensing fee – a fee not

28  required if the Cisco product was purchased through the "authorized" channel. *Id.* ¶ 171.

1    Cisco's licensing policy has legal ramifications. Cisco's surprising and inconspicuous

2    licensing restrictions are not enforceable in California and other states. *Id.* ¶¶ 170–73. And even if

3    the EULA were enforceable, Cisco is not permitted to use the agreement to thwart the first sale

4    doctrine by refusing to license its embedded software solely because consumers did not purchase the

5    hardware from Cisco or Cisco's Partners. *Id.* ¶ 173. In doing so, Cisco misrepresents consumers'

6    right to buy and use secondary market products. *Id.* ¶ 174. Through these practices, Cisco deters

7    some consumers from buying in the secondary market and extorts relicensing fees from others. *Id.*

8    ¶ 175.

9        **C.    Cisco's SMARTnet Abuse**

10    Cisco also leverages its exclusive control over essential software updates to functionally

11    incapacitate Cisco products sold on the secondary market. *Id.* ¶ 176. To receive these updates, which

12    are integral to the products' functionality, end users must purchase a "SMARTnet" contract from

13    Cisco. *Id.* ¶ 177. Cisco's requirement is atypical; most major technology companies provide software

14    updates to their customers free of charge. *Id.* ¶ 178.

15    Arbitech and BecTech frequently purchase SMARTnet coverage for their customers. *Id.*

16    ¶ 183. When Cisco accepts payment and generates the SMARTnet contract, it links an identified

17    product to an identified end user. *Id.* ¶ 182. However, in some cases, Cisco will void previously

18    purchased SMARTnet coverage for products traded on the secondary market – without providing a

19    refund, and without notifying the customers until they try to renew their coverage. *Id.* ¶ 184. Doing

20    so leaves consumers' hardware with critical security vulnerabilities and enriches Cisco at the expense

21    of secondary market resellers and end users.

22        **D.    Cisco's Wrongful Denial of Warranty Coverage**

23    Finally, Cisco has wrongfully denied warranty coverage of genuine Cisco products solely

24    because those products were sold in the secondary market. Cisco states as a general policy that

25    products sold on the secondary market are ineligible for Cisco warranties. *Id.* ¶ 189. Cisco's claimed

26    justification for this policy is that the secondary market contains counterfeits – even though Cisco

27    knows that the overwhelming majority of Cisco products on the secondary market are genuine, and

28

- 5 -
OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

that Cisco's own Partners (with Cisco's knowledge) sell counterfeits. *Id.* ¶¶ 189–95. Cisco's real rationale is to dissuade consumers from lawfully purchasing secondary market goods.

## III.   **PROCEDURAL HISTORY**

This litigation can be traced to May 2016, when Cisco conducted multiple "test buys" of Cisco products from BecTech. Cisco has alleged that one of the products it bought from BecTech (which BecTech acquired from Arbitech) was counterfeit. Arbitech purchased the product in question from one of Cisco's own channel Partners, a Chinese company called HongKong Sellsi ("Sellsi"). *Id.* ¶ 194. When Arbitech purchased the product, it relied on Sellsi's status as a Cisco partner and had no reason to believe that it was purchasing a counterfeit.[1] *Id.* ¶ 195. When Cisco confronted BecTech about the counterfeit product, BecTech immediately disclosed that it purchased the product from Sellsi. *Id.* ¶ 193. But rather than revoking Sellsi's partner status, Cisco sued BecTech, and later Arbitech, asserting a bevy of claims. *Id.* ¶ 194.

Cisco's January 2018 complaint primarily focused on allegations that BecTech was "involved in discount fraud schemes." Dkt. 1 at ¶ 1. BecTech moved to dismiss, pointing out that Cisco had alleged no fraud on anyone's part, least of all BecTech's. Dkt. 22 at 12. Cisco filed a First Amended Complaint ("FAC") that abandoned Cisco's discount fraud theory and asserted claims under the Lanham Act, the Digital Millennium Copyright Act, and state law. Dkt. 51. The FAC also added two defendants: Arbitech and HongKong Sellsi[2]. Arbitech and BecTech answered the FAC and filed

---

[1] Cisco identifies three allegedly counterfeit switches in its Motion but fails to mention that all three were purchased from its then-partner, Hong Kong Sellsi.  Cisco allowed Sellsi to remain a partner despite knowing that Sellsi was selling counterfeit Cisco products, FAC ¶¶ 46–51, and Arbitech and BecTech reasonably relied on Cisco's representation when purchasing the allegedly counterfeit products, AAC ¶¶ 193–95. Cisco's inexplicable decision to identify Sellsi as a partner that sells genuine Cisco products provides a basis for many of Arbitech and BecTech's affirmative defenses. *See* AAC ¶¶ 133–43.

[2] Why Cisco did not sue HongKong Sellsi originally – and why it allowed it to continue operating

1   counterclaims for declaratory relief, violations of California Unfair Competition Law, and the

2   Lanham Act. Dkt. 65. Cisco moved to dismiss, Dkt. 76, and Arbitech and BecTech amended their

3   answer and counterclaims. Dkt. 81. Cisco has since moved to dismiss again. Dkt. 84.

4   **IV.    LEGAL STANDARD**

5   Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is

6   entitled to relief." Fed. R. Civ. P. 8(a)(2). In deciding the motion to dismiss, the court must accept as

7   true all factual allegations in the countercomplaint and must draw all reasonable inferences from

8   those allegations, construing the countercomplaint in the light most favorable to the plaintiff. *Los*

9   *Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017). The Court may dismiss the

10  counterclaims only if "there is no cognizable legal theory or an absence of sufficient facts alleged to

11  support a cognizable legal theory." *Id.*

12  **V.     ARGUMENT**

13  Cisco has long employed anticompetitive and unfair business practices, often grounded on

14  incorrect interpretations of the law, to frighten consumers away from the secondary market and put

15  companies like Arbitech and BecTech out of business. Arbitech and BecTech have sufficiently

16  pleaded four counterclaims that are designed to force Cisco to bring its business model, including its

17  warranty and licensing policies, into compliance with the law. And because Arbitech and BecTech

18  seek to vindicate a public right on behalf of all consumers and secondary market participants, they

19  are entitled to attorney's fees. The Court should deny Cisco's Motion in its entirety.

20       **A.     Arbitech and BecTech Have Stated a Claim that the Resale of Genuine but**

21       **Unwarranted Cisco Products Does Not Violate the Lanham Act**

22  Arbitech and BecTech's first counterclaim seeks a declaration that the sale of genuine Cisco

23  products – which Cisco has unilaterally deemed ineligible for warranty services – does not violate

24  the Lanham Act, 15 U.S.C. §§ 1114, 1125. This is a consequence of a straightforward application of

25  the first sale doctrine, which – properly construed – prevents Cisco from using warranty services to

26  control distribution of its trademarked products beyond the first sale of the product. *See, e.g.,*

27  _____

28  as a partner *even after Cisco sued BecTech* – is entirely unclear.

1    *Sebastian*, 53 F.3d at 1074 ("Resale by the first purchaser of the original article under the producer's

2    trademark is neither trademark infringement nor unfair competition."). If the legality of Arbitech's

3    and BecTech's resale of Cisco goods were to depend on Cisco's unilateral decision to provide

4    warranty coverage, then Cisco could flout the first sale doctrine and control the resale of its goods

5    on the secondary market at will. Such an outcome would effect a radical shift in trademark law.

6          For this reason, it is well-established in the Ninth Circuit that a difference in access to the

7    trademark holder's "servicing and warranties" does not constitute a material difference for the

8    purposes of an infringement claim. *See NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1508 (9th

9    Cir. 1987) (granting summary judgment for defendants on trademark infringement claim who

10   imported genuine computer chips despite evidence that some customers "mistakenly thought"

11   products were protected by the trademark holder's "servicing and warranties"); *Huf Worldwide, LLC*

12   *v. Wal-Mart Stores, Inc.*, 2017 WL 766794, at *2 & *2 n.5 (S.D. Cal. Feb. 28, 2017) (collecting cases

13   and explaining that the "Ninth Circuit precludes an infringement claim based on voided warranties

14   alone"). The Ninth Circuit's conclusory, nonprecedential decision in *Toshiba Am. Info. Sys. v.*

15   *Advantage Telecom, Inc.*, 19 Fed. Appx. 646 (9th Cir. 2001), does not compel the opposite result.

16   Ignoring this Circuit's precedent, Cisco has claimed in its pleadings that its unilateral decision not to

17   warrant secondary market goods constitutes a material difference and therefore renders those

18   products infringing under the Lanham Act. *See* Compl. ¶ 56; FAC ¶ 24.

19         Cisco's Motion does not attack the merits of the first counterclaim by contending that

20   warranty coverage can ever be a material difference. Instead, Cisco contends that Arbitech and

21   BecTech may not pursue a declaratory judgment claim because (1) there is no controversy between

22   the parties and (2) the counterclaim is based on protected, litigation-related petitioning activity under

23   the *Noerr-Pennington* doctrine. Cisco is wrong on both counts.

         1.   <u>Cisco's Complaint and First Amended Complaint put warranty coverage at</u>
24

25              <u>issue</u>

26         Federal courts have "long accepted jurisdiction" in Declaratory Judgment Act cases where a

27   private party has threatened an enforcement action. *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*,

28   549 U.S. 118, 130 (2007). Here, Cisco did not just *threaten* an enforcement action; it *actually brought*

*one*. And it put warranty coverage squarely at issue in both its Complaint and its FAC, making this the paradigmatic situation for a declaratory judgment claim. *See* Compl. ¶ 56 (alleging that "entitlement to warranty services" is a material difference); FAC ¶ 36 (alleging that "inferior warranty" is a material difference).

Cisco now retreats from these allegations by saying that whether warranty coverage *alone* is a material difference is not in dispute. This is not a fair reading of Cisco's pleadings – but even if it were, Cisco has not provided support for its apparent position that Arbitech and BecTech's declaratory judgment counterclaim must exactly mirror Cisco's trademark infringement claim. Indeed, under Ninth Circuit case law, a declaratory judgment claim would still be appropriate, because what fundamentally is at issue here is whether, and in what situations, Arbitech and BecTech may legally resell Cisco products.

In the analogous patent infringement context, courts have made clear that an actual controversy exists "where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *Ours Tech., Inc. v. Data Drive Thru, Inc.*, 645 F. Supp. 2d 830, 834 (N.D. Cal. 2009) (quoting *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007)). Arbitech and BecTech face a similar dilemma here. In their view,  the only difference between the Cisco products they sell and the products sold within the Authorized Channel Network is warranty coverage.[3] Based on Cisco's prior litigation threats and conduct in this litigation, Arbitech and BecTech need only a "reasonable apprehension" of a future enforcement action for an actual controversy to exist. *Id.* Here, where Cisco has *already filed claims* relying in part on this theory, this standard is easily met.

Accordingly, Cisco has brought claims against Arbitech and BecTech for trademark infringement, and those claims clearly depend on a resolution of whether warranty coverage – alone or in combination with the other alleged differences – is relevant to the material-difference analysis

---

[3] Arbitech and BecTech also argue that Cisco's warranty policy violates New York and California law in sections V.B and V.C.1.

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

1  under the Lanham Act. Cisco cannot have it both ways and prevent Arbitech and BecTech from

2  obtaining a declaration of their rights on *that very same issue*.

3              2.      *Noerr-Pennington* does not apply: Arbitech and BecTech's counterclaim does

4                      not burden Cisco's protected petitioning conduct

5      *Noerr-Pennington* immunity depends on whether the defendant's conduct constitutes

6  protected petitioning activity and whether the proposed liability imposes a burden upon that activity.

7  *Mercer Pub., Inc. v. Smart Cookie Ink, LLC*, 2012 WL 12863934, *3 (W.D. Wash. July 25, 2012)

8  (citing *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009)). To be sure, protected

9  petitioning conduct may include filing a lawsuit and conduct incidental to a lawsuit, including pre-

10 suit demand letters. *See, e.g.*, *Theme Promotions, Inc. v. News Am. Marketing FSI*, 546 F.3d 991,

11 1007 (9th Cir. 2008) (holding that pre-suit demand letters were protected petitioning conduct); *Sosa*

12 *v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (same).  However, Cisco misunderstands when

13 a claim imposes a burden upon its protected activity.

14     Even though Cisco's litigation-related conduct constitutes protected petitioning activity,

15 Arbitech and BecTech seek only a declaration of their rights – not damages – so there is no

16 corresponding burden on Cisco's protected conduct. According to the Ninth Circuit, *Noerr-*

17 *Pennington* "immuniz[es] a party from liability and not from an entire claim." *Shell Gulf of Mexico,*

18 *Inc. v. Ctr. for Biological Diversity, Inc.*, 2012 WL 12865419, at *10 (D. Alaska June 26, 2012).  For

19 this reason, to Arbitech and BecTech's knowledge, the Ninth Circuit has never dismissed a

20 declaratory judgment claim based on the *Noerr-Pennington* doctrine, and Cisco has cited no such

21 instances. Moreover, other courts have rejected the application of *Noerr-Pennington* to claims for

22 declaratory relief. *WMH Tool Grp., Inc. v. Woodstock Int'l, Inc.*, 2009 WL 6825247, *12 (N.D. Ill.

23 Dec. 9, 2009) (refusing to apply *Noerr-Pennington* to claims for declaratory relief because "[t]he

24 *Noerr-Pennington* doctrine provides immunity from claims *for damages*") (emphasis in original);

25 *Knology*, 460 F.3d at 726 (explaining that a party prevailed on a declaratory judgment claim even

26 though it could not "seek money damages in light of the *Noerr-Pennington* doctrine").

27     Cisco cites a single case for the proposition that a declaratory judgment may burden its

28 petitioning activity:  *Westlands Water Distrib. Dist. v. NRDC, Inc.*, 276 F. Supp. 2d 1046 (E.D. Cal.

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

5566805

2003). *Westlands*, however, is inapposite, as it involved a plaintiff suing the NRDC over views that the NRDC expressed in a comment letter prior to an agency's final action. The *Westlands* court was concerned that petitioning citizens would be haled into court to defend declaratory actions at great expense, thereby creating a "chilling effect on protected petitioning activity" – *i.e.*, expressing their views in comment letters. *Id.* at 1054.  In contrast, here, Cisco's litigation-related conduct does not form the factual basis for Arbitech and BecTech's counterclaim. Instead, Arbitech and BecTech brought this counterclaim to resolve a concrete legal dispute with Cisco, not to chill or otherwise burden Cisco's protected petitioning activity. *See* AAC ¶¶ 197–203. Moreover, the reasoning in *Westlands* has been called into question by the only other court to discuss *Westlands*' application of the *Noerr-Pennington* doctrine. *See Shell*, 2012 WL 12865419, at *10 (explaining that the *Westlands* court "failed to cite any cases restricting the *Noerr-Pennington* doctrine to immunizing a party from liability and not from an entire claim, which is a restriction set forth in Ninth Circuit precedent").

Indeed, Cisco's position regarding *Noerr-Pennington* runs counter to numerous cases in the intellectual property context. Arbitech and BecTech's counterclaim is analogous to declaratory judgment actions by competitors who have been told they are infringing someone else's intellectual property rights – actions that are commonplace, especially in patent law. *See, e.g.*, *Indus. Models, Inc. v. SNF, Inc.*, 716 Fed. Appx. 949 (Fed. Cir. 2017) (barring antitrust claims pursuant to *Noerr-Pennington* but affirming summary judgment on a claim for declaratory relief of non-infringement); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1085 (9th Cir. 2000), *overruled in part on other grounds by Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006) (finding declaratory judgment jurisdiction based on trademark owner's cease-and-desist letter despite owner offering to waive trademark infringement and related claims); *Miller Pipeline Corp. v. British Gas PLC*, 69 F. Supp. 2d 1129, 1138–39 (S.D. Ind. 1999) (recognizing that "patentholder's competitors who receive infringement notices and threats to sue have available to them the vehicle of a declaratory judgment action"). If Cisco were correct that *Noerr-Pennington* bars claims for judgments of non-infringement, declaratory actions brought by alleged infringers that are commonplace would instead be non-existent. Cisco fundamentally misunderstands the application of *Noerr-Pennington* in the context of intellectual property law.

1     **B.**    **Arbitech and BecTech Have Stated a Claim that Cisco's Failure to Warrant**

2         **Secondary Market Goods Violates General Business Law section 369-b**

3     Arbitech and BecTech's second counterclaim seeks a declaration that Cisco's failure to

4 warrant genuine Cisco products acquired outside of the "Authorized Reseller Network" violates

5 section 369-b of the New York General Business Law and is unenforceable in New York. Section

6 369-b provides that "[a] warranty or guarantee of merchandise may not be limited . . . solely for the

7 reason that such merchandise is sold by a particular dealer or dealers[.]" Cisco's warranty policy

8 plainly violates this statute: Cisco limits the warranty on genuine Cisco goods "solely for the reason

9 that such merchandise is sold" by Arbitech, BecTech, or other secondary market dealers. *See Bel*

10 *Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 227 (S.D.N.Y. 2011) ("[T]he purpose of

11 this section of the GBL is to prevent enforcement of precisely the kind of policy adopted by Bel

12 Canto: denial of manufacture warranty service to customers . . . because goods were sold by

13 unauthorized dealers.") (quotation marks and citation omitted).

14     Cisco contends that this counterclaim fails as a matter of law because (1) there is no private

15 right of action under section 369-b and (2) Cisco does not limit a warranty *solely* because of the

16 identity of the seller. Once again, Cisco is wrong on both counts.

17            1.    <u>New York courts would imply a private right of action</u>

18     Despite suggesting that multiple *federal* courts in New York have held that there is no private

19 right of action under section 369-b, Cisco locates only one unpublished decision in support of this

20 proposition: *WorldHomeCenter.com, Inc. v. KWC America, Inc.*, 2011 WL 4352390, *9 (S.D.N.Y.

21 Sept. 15, 2011). *WorldHomeCenter.com* did find that no private right of action exists under the

22 statute, but the case is suspect authority. New York courts often imply private rights of action where

23 (1) the plaintiff is in the class for whose benefit the statute was enacted; (2) recognition of the private

24 right of action would promote the legislative purpose; and (3) creation of the right would be

25 consistent with the legislative scheme. *Sheehy*, 73 N.Y.2d at 633. In *WorldHomeCenter.com*, the

26 plaintiff "failed to address the[se] factors," and thus the court's corresponding discussion of them

27 was cursory. 2011 WL 4352390 at *8-*9.

28

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

5566805

1    This Court should reach a different outcome. According to the Practice Commentaries, the
2    purpose of section 369-b is to "prevent denial of manufacturer warranty service to customers …
3    because goods were sold by unauthorized dealers." Practice Commentary, McKinney's Consol. Laws
4    of N.Y., Book 19, at 523–24, Gen. Bus. Law § 369-b. Private enforcement would serve both the
5    consumer-protection and pro-competitive purposes because it would allow consumers and other
6    vendors to hold manufacturers accountable for anticompetitive warranty policies. Moreover, an
7    implied private right of action would complement the legislative scheme by allowing consumers and
8    dealers who are harmed by the warranty policy to bring lawsuits against the manufacturer. The
9    *WorldHomeCenter.com* court relied heavily on the fact that *other* subsections of the New York Fair
10   Trade Law – sections 369-e, -ee, and -eee – provide for enforcement by the New York Attorney
11   General of those subsections. *See, e.g.*, N.Y. Gen. Bus. Law § 369-e(8) ("An action for violation of
12   this section may be instituted by the attorney general … ."). But section 369-b does not say *anything*
13   about enforcement, by the Attorney General or otherwise. *See Negrin v. Norwest Mortgage, Inc.*, 263
14   A.D.2d 39, 47 (N.Y. App. Div. 1999) (finding an implied right of action where a statute was silent
15   as to enforcement). If the New York legislature had meant for only the Attorney General to enforce
16   section 369-b, it would have said so, as it did with other sections of the Fair-Trade Law.

17   Cisco also argues that if there is a private right of action, the counterclaim must fail because
18   section 369-b does not declare warranty policies "illegal or unlawful; rather the statute provides that
19   such provisions are simply unenforceable in the courts of [New York]." *See People v. Tempur-Pedic*
20   *Int'l, Inc.*, 95 A.D.3d 539, 540 (N.Y. App. Div. 2012). But *Tempur-Pedic* concerned minimum resale
21   prices governed by section 369-a, not section 369-b. The language of each section meaningfully
22   differs. Section 369-a states:

23         Any contract provision that purports to restrain a vendee of a commodity from
24         reselling such commodity at less than the price stipulated by the vendor or producer
25         shall not be enforceable or actionable at law.

26   When concluding that section 369-a does not declare contract provisions to be illegal or unlawful,
27   the *Tempur-Pedic* court relied on the "will not be enforceable or actionable at law" language. *Id.* In
28   contrast, section 369-b does not use such language and instead states:

- 13 -

1
2
3
4

> A warranty or guarantee of merchandise may not be limited by a manufacturer doing business in this state solely for the reason that such merchandise is sold by a particular dealer or dealers … . Any attempt to limit the manufacturer's warranty or guarantee for the aforesaid reason is void.

5   Section 369-b thus provides that a warranty "may not be limited" according to a dealer's identity.

6   This restrictive language – not present in section 369-a – indicates that such a limitation would violate

7   the statute and therefore be unlawful.

8        As Cisco acknowledges, the counterclaim seeks a declaration that the warranty policy

9   "violates New York General Business Law § 369-b *and is unenforceable in New York*." AAC ¶ 205.

10  Even if the Court extends the reasoning in *Tempur-Pedic* to section 369-b, it still should declare

11  Cisco's warranty policy unenforceable in New York.

12       Finally, even if the Court finds that section 369-b does not imply a private right of action, this

13  claim still provides a valid predicate for Arbitech and BecTech's section 17200 claim. *See* section

14  V.A.1, *infra*; *see also West v. Palo Alto Housing Corp.*, 2018 WL 1184950, *16 (N.D. Cal. Mar. 7,

15  2018) ("[I]t is well-established that conduct that is prohibited by a statute may be actionable under

16  the UCL's unlawful prong even if the predicate statute does not provide a private right of action.")

17  (internal quotation marks omitted).

18            2.    Cisco's warranty expressly disclaims coverage of secondary market products

19       Cisco next argues that the second counterclaim does not identify any Cisco warranty policy

20  that violates section 369-b, insisting that Cisco does not limit a warranty *solely* due to the seller's

21  identity. Not so.  Section 3 of Cisco's warranty policy expressly disclaims coverage of secondary

22  market products. *See* AAC ¶ 189 n.8 (citing Cisco Public Non-Entitlement Policy, which provides in

23  section 3(D)(1) that "[a]ny Secondary Market Product is ineligible for any kind of Cisco warranty or

24  service support unless it becomes eligible through inspection, licensing, and other applicable

25  processes"). Regardless, Cisco's contrary factual contention regarding its warranty policy cannot be

26  resolved at the motion-to-dismiss stage. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.

27  1986) ("We must accept all material allegations in the complaint as true and construe them in the

28  light most favorable to [the plaintiff].").

**C.     Arbitech and BecTech Have Stated a Claim that Cisco Violated the Unlawful, Unfair, and Fraudulent Prongs of California's Unfair Competition Law**

Arbitech and BecTech's third counterclaim asserts that Cisco has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, which proscribes all business acts that are unlawful, unfair, or fraudulent. Each prong provides a separate and distinct theory of liability. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). The California Legislature "intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, … the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) (internal quotation marks omitted). Arbitech and BecTech have sufficiently alleged independent violations of the UCL under each of the unlawful, unfair, and fraudulent prongs.

### 1.     Cisco has engaged in unlawful behavior

The "unlawful" prong borrows substantive content from other laws and treats violations of those laws as actionable under the UCL. *Id.* at 539-40. Arbitech and BecTech have asserted at least two legal hooks for this prong: a violation of section 369-b of the New York General Business Law and a violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). The merits of these claims are discussed in sections V.B and V.D, respectively. Importantly, the section 369-b claim provides a valid predicate for the Section 17200 claim even if this Court finds that section 369-b does not imply a private right of action. *See West*, 2018 WL 1184950, at *16 ("[I]t is well-established that conduct that is prohibited by a statute may be actionable under the UCL's unlawful prong even if the predicate statute does not provide a private right of action.").

### 2.     Cisco has engaged in unfair behavior

Arbitech and BecTech also assert that Cisco has engaged in unfair conduct under section 17200, defined as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 973 P.2d at 544.

1    Arbitech and BecTech may also prevail under the UCL's "balancing test," which examines whether

2    the business practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to

3    consumers and requires the court to weigh the utility of the defendant's conduct against the gravity

4    of the harm to the alleged victim." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247,

5    257 (Cal. Ct. App. 2010).

6         Arbitech and BecTech advance numerous allegations related to Cisco's efforts to abuse the

7    secondary market and the consumers who are served by it. Cisco's imposition of a software licensing

8    agreement *after* a consumer believes he or she has purchased the entire product – including embedded

9    software required for the hardware to function – is both unethical and substantially injurious to

10   consumers. AAC ¶¶ 170–71.   Moreover, Cisco denies secondary market purchasers' access to

11   SMARTnet coverage, which provides critical software bug fixes, patches, and updates that are

12   essential to the operation of Cisco products. *Id.* ¶ 177. Thus, even though Cisco concedes that

13   consumers may legally purchase its hardware on the secondary market, it leverages its ability to

14   functionally incapacitate such products to exert monopolistic control over the secondary market.

15        In fact, whether Cisco's EULA is even enforceable under California law presents complicated

16   factual and legal questions of California contract law that cannot be resolved at this stage. And if the

17   EULA is an unenforceable contract, then Cisco's enforcement of it unquestionably constitutes unfair

18   behavior when weighing "the utility of [Cisco's] conduct against the gravity of the harm." *Drum*,

19   182 Cal. App. 4th at 257; *see also McVicar v. Goodman Global, Inc.*, 1 F. Supp. 3d 1044, 1054 (C.D.

20   Cal. 2014) (holding that plaintiffs stated a claim under the UCL balancing test by alleging that the

21   defendant harmed them by not honoring a warranty).

22        For Cisco to show that its EULA was enforceable under California contract law, it must

23   demonstrate mutual assent – *i.e.*, that consumers received adequate notice of its existence, either on

24   the box ("shrinkwrap"), in the box, or through assent when turning the products on ("clickwrap").

25   This is a factual question. The Ninth Circuit has recognized that under certain circumstances, an in-

26   the-box contract is ineffective if the customer does not receive adequate notice of its existence.

27   *Norcia*, 845 F.3d at 1290 (holding that "Samsung's inclusion of a brochure in the Galaxy S4 box,

28   and Norcia's failure to opt out, does not make the arbitration provision enforceable against Norcia").

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

Moreover, the Ninth Circuit has explained that whether shrinkwrap license agreements are enforceable under California law is an open question:

> Our unreasoned conclusion [in *Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*, 447 F.3d 769, 782 (9th Cir. 2006)] that California courts would enforce a shrink-wrap license is not free from doubt. *Lozano* did not cite any California cases and has since been vacated. We have found no California case addressing this issue, and Samsung has cited none.

*Id.* at 1286 n.1; *see also Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 566–67 (9th Cir. 2014) (finding a shrink-wrap agreement invalid under California law because "when the writing does not appear to be a contract and the terms are not called to the attention of the recipient"). The Ninth Circuit also has declined to enforce clickwrap agreements in certain contexts. For example, in *SoftMan Prods. Co., LLC v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075, 1087 (C.D. Cal. 2001), the court held that a software licensing agreement did not apply where a purchaser of Adobe software never loaded the software onto its computer, and therefore never asked to agree to the terms of a license.

Arbitech and BecTech have alleged that resellers and consumers who purchase Cisco products also purchase the embedded software. *See* AAC ¶¶ 170–75. Moreover, Arbitech and BecTech alleged that end users have not "acknowledge[d], read, or accept[ed]" the EULA. *Id.* ¶ 170. Cisco has the burden to show that "there was a legitimate license at the outset, [and that] downstream customers were 'bound by a restrictive license agreement' such that they are 'not entitled to the first sale doctrine.'" *Microsoft Corp. v. A&S Elecs., Inc.*, 2017 WL 976005, at *3 (N.D. Cal. Mar. 14, 2017). The Court cannot resolve this factual issue on a motion to dismiss.

Cisco cites two Ninth Circuit cases for the proposition that software licenses are not subject to the first-sale doctrine, but both cases are distinguishable. In *Apple, Inc. v. Psystar Corp.*, 658 F.3d 1150, 1156 (9th Cir. 2011), and *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111-12 (9th Cir. 2010), the court determined that the copyright holder could impose certain restrictions on defendants who had agreed to a valid license. But *Apple* and *Vernor* discuss the first sale doctrine in the context of *standalone* software licenses. *See Apple*, 658 F.3d at 1156 (discussing restrictions on a licensee's use

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

of retail-packaged Mac OS X software); *Vernor*, 621 F.3d at 1116 (discussing restrictions on a licensee's use of architectural design software). Standalone licenses are not at issue here; embedded software is. Cisco locates one unpublished, out-of-circuit district court case for the proposition that the first sale doctrine also does not apply to embedded software. *See Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, *6-*7 (N.D. Ill. Aug. 29, 2013) (holding that the first sale doctrine did not apply to licensed software inside a mass spectrometer). But the court did not analyze the anticompetitive effects or otherwise grapple with the implications of its decision. In today's modern economy, virtually all consumer electronics contain embedded software, and courts in the Ninth Circuit have not yet addressed how to apply trademark and copyright law to these arrangements.

This Court, therefore, must consider whether Cisco's licensing practices have anticompetitive effects or are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum*, 182 Cal. App. 4th at 257.

Given the ubiquity of products with embedded software, very few manufacturers dare tell consumers they may not use those products unless they bought them from an approved source. Cisco is one of the few. If Cisco were correct that embedded software is *per se* not subject to the first sale doctrine, then the first sale doctrine would be meaningless for huge swaths of products that are commonly resold – everything from cars to phones to televisions to children's electronic toys. A landlady who installs a software-enabled thermostat in a rental property could not permit her renters to operate it. An underclassman who is gifted a used graphing calculator from a graduating senior would violate a software license agreement and be liable for damages and fees. Used car dealerships would be nonexistent, as automakers could refuse to relicense embedded software and instead would demand that consumers buy new cars instead. Cisco tells consumers this is indeed the world they live in, so that it can extract fees and divert business away from the secondary market to itself.

Although Courts have not yet grappled with the application of copyright law to consumer products with embedded software, the U.S. Copyright Office has recognized the challenges that the licensing of embedded software presents. *See* U.S. Copyright Office, *Software-Enabled Consumer Products* (December 2016), *available at* https://www.copyright.gov/policy/software/software-full-

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

5566805

1   report.pdf (stating that the "near-ubiquity" of software-enabled products "has led some to question

2   whether current copyright laws provide adequate guidance" on areas "including resale, repair,

3   research, and beyond"). Arbitech and BecTech are entitled to take discovery and develop the factual

4   basis for their claim so that this Court can weigh whether Cisco's behavior constitutes an unfair

5   business practice.

6          Cisco cites *Blizzard Entertainment Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227,

7   1237 n.8 (C.D. Cal. 2013), for the proposition that a section 17200 claim cannot be based on its

8   enforcement of the EULA. But *Blizzard* is factually and legally distinguishable. *Blizzard* involves

9   licensing restrictions placed on standalone computer software "which the purchasers agreed to

10  upfront." *Id.* In contrast, the users of Cisco products are neither informed about licensing restrictions

11  of the embedded software prior to purchase, nor required to read or accept the terms of the EULA

12  after purchase. AAC ¶ 170; *see Microsoft*, 2017 WL 976005, at *4 (denying summary judgment on

13  copyright infringement claim because "Microsoft has presented no evidence to suggest that a

14  purchaser would have seen, much less be bound by, the Amazon volume licensing agreement").

15  Moreover, the *Blizzard* court did not consider whether the licensing restrictions violated the UCL's

16  "balancing test." *See Drum*, 182 Cal. App. 4th at 257. Cisco has provided no Ninth Circuit authority

17  that it may use its EULA to control the downstream distribution of its embedded software products.

18                       3.      Cisco has engaged in fraudulent behavior

19         Arbitech and BecTech have stated a claim with particularity under the fraudulent prong of

20  the UCL. Cisco makes routine false or misleading representations of fact regarding the effect of the

21  EULA and whether products sold on the secondary market are "used." As described in more detail

22  in section V.D, Arbitech and BecTech have alleged specific false or misleading representations of

23  fact, who made the statements, how consumers are exposed to them, and how consumers rely on

24  those statements when purchasing Cisco products. *See Kearns*, 567 F.3d at 1126 (requiring that a

25  plaintiff "articulate the who, what, when, where, and how of the misconduct alleged"). Arbitech and

26  BecTech have adequately alleged that "members of the public are likely to be deceived" by the

27  targeted conduct. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

28

1     **D.**    **Arbitech and BecTech Have Stated a Claim that Cisco Has Engaged in False or**

2         **Misleading Representations of Fact in Violation of the Lanham Act**

3     Cisco has made numerous false or misleading representations of fact regarding Cisco

4 products sold on the secondary market. Section 43(a) of the Lanham Act provides that it is unlawful

5 for any person to use a "false or misleading description of fact, or false or misleading representations

6 of fact, which … in commercial advertising or promotion, misrepresents the nature, characteristics,

7 qualities, or geographic origin of his or her or another person's goods, services, or commercial

8 activities." 15 U.S.C. § 1125(a)(1)(B). To prevail, Arbitech and BecTech need to show that a given

9 statement "was literally false, either on its face or by necessary implication, or that the statement was

10 literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*,

11 108 F.3d 1134, 1139 (9th Cir. 1997). If a statement is literally false, or "if the words or images,

12 considered in context, necessarily imply a false message, the advertisement is literally false and no

13 extrinsic evidence of consumer confusion is required." *Time Warner Cable, Inc. v. DirecTV, Inc.*,

14 497 F.3d 144, 158 (2d Cir. 2007).

15     Even under the heightened Rule 9(b) pleading standard, allegations of fraud need only be

16 "specific enough to give defendants notice of the particular misconduct which is alleged to constitute

17 the fraud charged so that they can defend against the charge and not just deny that they have done

18 anything wrong." *Bobbleheads.com, LLC v. Wright Bros., Inc.*, 259 F. Supp. 3d 1087, 1095 (S.D.

19 Cal. 2017) (quoting *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)). Arbitech and BecTech

20 have alleged with particularity the false and misleading statements that Cisco has made regarding

21 secondary market products and its licensing agreement.

22         1.    <u>Cisco misclassifies secondary market goods</u>

23     Cisco routinely misclassifies genuine, lawfully obtained Cisco products as "used," "stolen,"

24 "counterfeit," or "scrapped" to deter consumers from purchasing Cisco goods on the secondary

25 market. *See* AAC ¶¶ 185–88, 219–20. Most notably, on its website, Cisco defines "used" as

26 "previously owned equipment that is now owned by a party other than the original customer,"

27 including both "opened and unopened equipment." *Id.* ¶ 186. Cisco also instructs its employees to

28 inform customers that "unopened boxes do[] not necessarily mean [that equipment is] 'new.'" *Id.*

1   Cisco intends for this bizarre definition of "used," which is contrary to consumer understanding, to

2   mislead consumers and deter them from purchasing goods on the secondary market. *Id.* ¶¶ 188, 219–

3   20.

4       Cisco contends that its description of "used" is literally true because a *dictionary.com* entry

5   defines "used" as "previously owned or sold; secondhand." This argument is self-defeating. If Cisco

6   were to faithfully apply this definition of "used," then *no* Cisco products sold to end users could

7   properly be called "new." Even in Cisco's authorized channel, Cisco products are bought and sold

8   multiple times before reaching end users: after a contract manufacturer such as Foxconn produces

9   the products, Cisco sells the products to authorized distributors, who then resell the products to

10  Cisco's Partners, who sell the products to end users at market rates.

11      Cisco also argues that "used" is susceptible to more than one interpretation, relying on *Time*

12  *Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d at 158. But, as *Time Warner* made clear, if a statement

13  is literally true but necessarily implies a false message when considered in context, the advertisement

14  qualifies as "literally false" for Lanham Act purposes. *Id.* The facts in *Time Warner* are illustrative.

15  A cable company sought to preliminarily enjoin a DirecTV commercial stating that "settling for cable

16  would be illogical." *Id.* Although that sentence could be susceptible to multiple meanings, in context,

17  the statement "clearly referred to cable's HD [supposedly inferior] picture quality." *Id.* at 154. The

18  court therefore concluded that the cable company had established a likelihood of success on the

19  Lanham Act claim. Similarly, when read in context, Cisco's use of the word "used" is intended

20  precisely to confuse consumers into believing that products they purchase on the secondary market

21  have been previously deployed, or "used," by someone else. *Id.* ¶¶ 188, 220. It hardly requires saying

22  that in the typical consumer lexicon, an unopened product is not "used." *Id.* ¶¶ 187, 219.

23      Cisco's other factual contentions cannot be resolved at this stage. Cisco contends that its

24  statement is literally true but relies on a case that denied a motion to dismiss because falsity depended

25  on the "context and materiality" of the advertisement. *See LivePerson, Inc. v. 24/7 Customer, Inc.*,

26  83 F. Supp. 3d 501, 518 (S.D.N.Y. 2015). Similarly, Cisco contends that "[p]urchasers of Cisco's

27  networking products … are sophisticated consumers who would read Cisco's definition." Motion at

28

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

5566805

19. But as *Kwan Software Engineering, Inc. v. Foray Techs., LLC*, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014), makes clear, "[l]iteral falsity is a question of fact."

### 2.   Cisco misrepresents the legal effect of its licensing agreement

In addition, Cisco's EULA purports to license Cisco software only to consumers who have purchased Cisco hardware with embedded software from a so-called "Approved Source." *See* AAC ¶¶ 169–75, 218–20. Cisco informs consumers that the "embedded Cisco software that runs on the hardware" is nontransferable, and that purchasers of secondary market Cisco goods "must acquire a new license from Cisco before the software can be used." *Id.* ¶ 171. These representations are false. As discussed above, Cisco's attempt to license its embedded software after a consumer has purchased its products runs afoul of California contract law. *Id.* Additionally, pursuant to the first sale doctrine, Cisco cannot refuse to license the software which it builds into the hardware to control the downstream distribution of its goods. *Id.* ¶ 173; *see also Practice Management*, 121 F.3d at 520–21 (holding that a copyright holder's anticompetitive restrictions in a license constituted copyright misuse).

Cisco insists that its EULA is lawful because software licenses are *per se* exempt from the first sale doctrine. But as set forth above, this is not presently the law. Whether Cisco's licensing practices are lawful is *what is at issue here*, and it may not question-beg away a Lanham Act claim by simply insisting that what it does is legal.

### 3.   Arbitech and BecTech sufficiently pleaded materiality and proximate causation

Cisco also argues that Arbitech and BecTech's Lanham Act claim must fail because the statements it makes are not material or that any harm to Arbitech and BecTech is not proximately caused by the statement. As an initial matter, it is puzzling that Cisco contests materiality in light of its own allegations that secondary market products are "materially different." *See* FAC ¶ 24 (describing secondary market products as materially different because they do not "conform with Cisco's high standards" and must be relicensed). Regardless, Arbitech and BecTech are not required to present any evidence of consumer confusion for statements that are literally false or false by necessary implication. *Time Warner*, 497 F.3d at 158. And the countercomplaint extensively

- 22 -

5566805

describes Cisco's efforts to discourage secondary market sales of its products, AAC ¶¶ 162–67, alleges that Cisco's misrepresentations regarding the effect of the EULA have "successfully deter[red]" secondary market purchasers, *id.* ¶ 174, and alleges that "but for Cisco's misrepresentations and misuse of the term 'used,'" consumers would have purchased products on the secondary market, *id.* ¶¶ 188, 220. In other words, the counterclaim alleges that the "deception is material, in that it is likely to influence the purchasing decision … ." *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003) (quoting *Cook, Perkiss, and Liehe, Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)).

Finally, Cisco correctly explains that the Lanham Act requires a party to show "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiffs." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Cisco adds that the harm cannot be "too remote" and that the "Defendants never explain how Cisco's statements allegedly caused them to lose sales." Motion to Dismiss at 21. But Cisco overlooks numerous factual allegations and the direct and obvious relationship between Cisco's misstatements and Arbitech and BecTech's harm.

Arbitech and BecTech have adequately alleged that Cisco made numerous misrepresentations related to the EULA and "used" goods that successfully dissuaded consumers from purchasing Cisco goods from secondary market resellers such as Arbitech and BecTech. AAC ¶¶ 171–74, 188. Contrary to Cisco's assertions, this harm is easily traceable. *See Lexmark*, 572 U.S. at 138 (describing the "diversion of sales to a direct competitor" as the "paradigmatic direct injury" cognizable under the Lanham Act). And Cisco's flippant treatment of Arbitech and BecTech's allegations is unwarranted: as active resellers in the secondary market for Cisco products, Arbitech and BecTech have accumulated substantial knowledge about the effect of Cisco's advertisements on their customers. Arbitech and BecTech have plausibly alleged proximate causation.[4]

_____

[4] Cisco also moves to strike Arbitech and BecTech's request for damages, lost profits, and treble

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

5566805

1

**E.    Arbitech and BecTech Are Entitled to Attorney's Fees**

2      Arbitech and BecTech will be entitled to attorney's fees under section 1021.5 of the

3 California Code of Civil Procedure if this litigation: "(1) served to vindicate an important public

4 right; (2) conferred a significant benefit on the general public or a large class of persons; and (3)

5 imposed a financial burden on [counterclaimants] which was out of proportion to their individual

6 stake in the matter." *Baggett*, 32 Cal. 3d at 142. Arbitech and BecTech's allegations are sufficient to

7 meet each of these requirements at the motion-to-dismiss stage.

8      Arbitech and BecTech's counterclaims assert violations of consumer-protection laws and

9 accordingly vindicate public rights. The purpose of the UCL is to protect consumers and businesses

10 by "promoting fair competition in commercial markets for goods and services." *Kasky v. Nike, Inc.*,

11 27 Cal. 4th 939, 949 (2002). The same can be said for the Lanham Act's false advertising provisions.

12 For this reason, "If a plaintiff prevails in an unfair competition law claim, it may seek attorney fees

13 as a private attorney general pursuant to Code of Civil Procedure section 1021.5." *Walker v.*

14 *Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1179 (2002). The purpose of section 369-b

15 is to "prevent denial of manufacturer warranty service to customers … because goods were sold by

16 unauthorized dealers." Practice Commentary, McKinney's Consol. Laws of N.Y., Book 19, at 523–

17 24, Gen. Bus. § 369-b. At bottom, these counterclaims are vindicating rights for consumers, not

18 Arbitech and BecTech, and therefore will confer a significant benefit on the general public.

19      Cisco does not address the consumer-protection rationale of these statutes, arguing only that

20 the counterclaims are a "means for [Arbitech and BecTech] to continue their infringing and otherwise

21 unlawful commercial behavior." Motion at 22. Cisco also argues that the only benefit would be

22 incurred to a "small subset of the general population," namely, Arbitech, BecTech, and their

23 customers. *Id.* Cisco's restrictive view of the litigation makes no sense. *All* Cisco customers – not

24

25 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26 damages. As Cisco recognizes, this request turns on whether the Court dismisses the Lanham Act

27 counterclaim. Because Arbitech and BecTech have sufficiently pleaded a Lanham Act violation,

28 their request for damages, lost profits, and treble damages are not subject to strike.

1  just customers of Arbitech and BecTech – will benefit from the increased competition for Cisco-

2  branded products that would result from this litigation.

3         Finally, Cisco argues that the litigation does not impose a financial burden on Arbitech and

4  BecTech out of proportion to their individual stakes in the matter. *See Cal. Licensed Foresters Assn.*

5  *v. State Bd. of Forestry*, 30 Cal. App. 4th 562, 570 (Cal. Ct. App. 1994) (comparing "the litigant's

6  private interests with the anticipated costs of suit"). Cisco overlooks the difference in market power

7  and resources between it, Arbitech, BecTech, and other participants in the secondary market. End

8  users do not litigate these claims; neither do most secondary market resellers, who do not have the

9  economic or legal resources to take on a technological behemoth like Cisco. When Cisco mails

10  litigation threats and files lawsuits against independent resellers, the economically rational response

11  for many of those resellers is to roll over. Arbitech and BecTech are willing to shoulder a significant

12  burden to the benefit of all secondary market resellers and consumers. That Arbitech and BecTech

13  also will benefit from these counterclaims does not preclude them from recovering attorney's fees.

14  *See, e.g.*, *Baggett*, 32 Cal. 3d at 143 (holding that plaintiff police officers were entitled to attorney's

15  fees for securing procedural rights for themselves and other police officers).

16         It would be premature for the Court to strike Arbitech and BecTech's request for attorney's

17  fees at this stage of the litigation.

18  **VI.    <u>CONCLUSION</u>**

19         For the foregoing reasons, Arbitech and BecTech respectfully request that the Court deny

20  Cisco's Motion to Dismiss and/or Strike in its entirety. Should the Court grant the Motion in part or

21  in whole, Arbitech and BecTech respectfully request leave to amend their counterclaims. *See*

22  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051–52 (9th Cir. 2003) (stating that leave

23  to amend under Fed. R. Civ. P. 15(a)(2) "shall be freely given when justice so requires" and that this

24  policy is "to be applied with extreme liberality").

25  Dated: June 21, 2019                                    HUESTON HENNIGAN LLP

26
                                                           By:    */s/ Douglas J. Dixon*
27                                                               Douglas J. Dixon
                                                                 *Attorneys for Defendants and*
28                                                               *Counterclaimants BecTech and Arbitech*

5566805

1

**CERTIFICATE OF SERVICE**

2

I certify that a true and correct copy of the above and foregoing document was duly served

3   electronically on all known counsel of record through the Court's Electronic Filing System on the

4   21st day of June, 2019.

5

Executed this 21st day of June, 2019, at Newport Beach, California.

6

7

_____*/s/ Douglas J. Dixon*_____
Douglas J. Dixon

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO CISCO'S MOTION TO DISMISS AND/OR STRIKE

5566805